[Cite as *In re K.M.S.*, 2017-Ohio-142.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

IN RE:

CASE NO.  9-15-37

    K.M.S.,

ABUSED, DEPENDENT
NEGLECTED CHILD.              **O P I N I O N**

[AMBER SMITH - APPELLANT]

---

IN RE:

CASE NO.  9-15-38

    K.S.,

ABUSED, DEPENDENT
NEGLECTED CHILD.              **O P I N I O N**

[AMBER SMITH - APPELLANT]

---

IN RE:

CASE NO.  9-15-39

    M.C.,

ABUSED, DEPENDENT
NEGLECTED CHILD.              **O P I N I O N**

[AMBER SMITH - APPELLANT]
[THOMAS CONKLE - APPELLANT]

**Appeals from Marion County Common Pleas Court**
**Juvenile Division**
**Trial Court Nos. 13 AB 0006, 13 AB 0007 and 13 AB 0008**

**Judgments Affirmed**

**Date of Decision:   January 17, 2017**

**APPEARANCES:**

   *Robert C. Nemo* **for Appellant, Thomas Conkle Jr.**

   *Todd A. Workman* **for Appellant, Amber Smith**

   *Justin J. Kahle* **for Appellee**

**SHAW, J.**

{¶1}   This consolidated appeal concerns custody of three minor children K.M.S. (case number 13AB0006), K.S. (case number 13AB0007), and M.C. (case number 13AB0008).  The appellants are the mother of the children, Amber Smith ("Amber"), and the father of M.C., Tom Conkle ("Tom").  The father of K.M.S. did not participate in the trial court proceedings despite being properly served, and the father of K.S. remains unknown.

{¶2}   Amber and Tom appeal the September 14, 2015 judgments of the Marion County Court of Common Pleas, Family Division, which granted the motions for permanent custody of the children filed by Appellee, Marion County Children Services ("the Agency"), and terminated Amber's and Tom's parental

rights. On appeal, Amber and Tom claim the trial court (1) erred in determining that granting the motion for permanent custody and terminating their parental rights is in the children's best interest; (2) erred in finding that the Agency used reasonable efforts to reunify them with the children; (3) erred in finding that the children could not be placed with them in a reasonable amount of time or should not be placed with them; and (4) committed prejudicial error by not ruling on the appropriateness of an alternative placement that would have been in the best interest of the children.

### *Statement of the Case*

**{¶3}** While these appeals concern three separate cases with two separate appellants, we will discuss their procedural histories together, as they are intertwined.

### *Initial Agency's Involvement*

**{¶4}** The Agency filed complaints in all three cases on January 10, 2013, alleging that Amber's children were neglected and dependent children, as defined in R.C. 2151.03 and 2151.04. (Doc. No. at 1.) [1] At the time, K.M.S. was eight years old, K.S. four years old, and M.C. four months old. The complaint stated that the children lacked adequate parental care and that their condition or environment warranted guardianship by the State because Amber was smoking marijuana in the home in front of the children and allegedly told the oldest, K.M.S., that she would "woop her butt until it bleeds" if she told anyone about the drug use. (*Id.*) The

---

[1] Since the relevant filings in each of the cases were the same, all record references are to the case 13AB0008.

complaint further alleged that Amber was giving K.M.S.'s ADHD medication to her friends, and that K.S. "had been choking the baby." (*Id.*)

{¶5} The trial court appointed a guardian ad litem ("GAL") for the children. After a hearing, the trial court issued temporary orders by which it required Amber to abstain from the use of illegal drugs, complete drug screenings, and allow the Agency to enter the home to assess the safety and well-being of the children.

{¶6} On February 7, 2013, the Agency filed amended complaints, in which it listed Tom as the father of M.C. The first case plan was filed and approved on February 8, 2013. It listed Tom as the biological father of M.C. and a nonrelated adult of K.M.S. and K.S. The concerns expressed in the plan included Amber having difficulty dealing with K.M.S.'s unruly behavior, failure to give K.M.S. her ADHD medicine, M.C. being born underweight and drug positive, Amber's and Tom's ongoing drug use, as well as Amber's mental health and history of abuse as a child. The plan included objectives for Amber and Tom to complete in order to reduce risk and address safety issues of the children.

{¶7} On February 27, 2013, Amber appeared in court for an adjudication pre-trial and agreed to stipulate to the children being dependent. (Doc. Nos. 18, 19.) Tom did not appear at the hearing. The Agency presented evidence in support of its complaint and the trial court made dependency findings as to K.M.S., K.S., and M.C. with regard to Amber based upon Amber's stipulation and the evidence presented by the Agency. (*Id.*)

**{¶8}** On April 19, 2013, the trial court held an adjudication hearing based upon the Agency's complaint, where Amber, the GAL and counsel for the Agency were present. The trial court found by clear and convincing evidence K.M.S. and K.S. to be dependent children as to Amber and their fathers. The trial court issued orders permitting the children to remain in Amber's legal custody. (Doc. Nos. 22, 24.) Tom did not appear for the adjudication hearing and a separate hearing for adjudication was set for Tom pertaining to his parental rights to M.C. (Doc. No. 24.)

**{¶9}** On April 29, 2013, Tom appeared before the court. The trial court advised Tom of his right to counsel during the proceeding and his right to have one appointed if he were determined to be indigent. Tom waived his right to counsel and stipulated to M.C. being a dependent child. (Doc. Nos. 25, 26.) Based upon the stipulations and the evidence presented by the Agency in support of its complaint, the trial court found M.C. to be a dependent child. The trial court issued orders allowing the children to remain in the legal custody of Amber, but with a "safety plan" in effect directing Amber not to have unsupervised contact with the children or be under the influence of drugs while with the children. Tom was to assist Amber in providing care for the children and arrange for appropriate care while he was at work. (*See* Doc. No. at 26, 27). The matter was set for a thirty-day review.

*Temporary Custody*

**{¶10}** On May 20, 2013, the Agency filed a motion for temporary emergency custody of the children because Amber tested positive for heroin and marijuana while caring for the children. (*See* Doc. No. at 27.) In support of the motion, the Agency stated that it had decided to discontinue the "safety plan" because Amber had not tested positive for heroin since the "safety plan" was initiated.[2] On May 13, 2013, the caseworker went to the home to inform Amber that the "safety plan" would no longer be in effect. The caseworker was greeted by an individual at the home who informed her that Amber was not there and was living at her old apartment. The caseworker went to Amber's apartment, but was not able to make contact with her. The next morning, the caseworker returned to both Tom's home and Amber's apartment and was not able to make contact with Amber at her apartment until the following afternoon. At that time, the caseworker observed Amber caring for the children in her apartment with her cousin present. The caseworker administered a drug screen to Amber and she tested positive for marijuana, heroin, and Klonipin. The caseworker reported that Amber admitted to the drug use and indicated that she was in possession of illegal drugs, which she intended to sell for money.

---

[2] Notably, Amber was still consistently testing positive for marijuana on every drug screen administered during this time.

{¶11} The same day, the trial court granted the Agency's motion for emergency temporary custody of the children, removing the children from Amber's custody. Tom subsequently requested and was appointed counsel. The Agency filed a new case plan to assist Amber's and Tom's reunification with the children. The case plan identified objectives focusing on Amber's and Tom's substance abuse and addiction problems, as well as mental health issues. The caseworker also gave Amber and Tom the appropriate referrals to begin treatment and counseling for addiction and substance abuse, and for Amber to address her mental health concerns.

{¶12} Initially, K.M.S. and K.S. were placed together with the same foster family, while M.C. was in another placement. Throughout the course of the proceedings, K.M.S. had five different placements because of her behavioral problems, which manifested in K.M.S. attempting to or actually hurting other children in the household, including K.S.[3] K.M.S. was placed with a relative for a short period of time, but the placement was disrupted due to her behavior. The Agency explored other potential kinship placements for each of the children, but could not find a suitable relative willing to accept the placement. K.M.S. was eventually placed at a state facility, Buckeye Ranch, where she continued to exhibit behavioral problems. K.S. also displayed behavioral issues, and the Agency was

---

[3] On one occasion, K.M.S. reportedly pressed the button to close the garage door while a fifteen-month-old child living in the home was standing underneath the door. K.M.S. failed to alert anyone and instead watched the door close down. (Doc. No. 39 at 5).

concerned that Amber and Tom could not handle the children's problems without first receiving help themselves. K.S. and M.C. appeared to thrive in their foster placements despite initial health and behavioral concerns.

{¶13} The record discloses that throughout the first year of the Agency's involvement, Amber and Tom struggled to remedy their substance abuse and addiction issues. Amber initially participated in rehabilitation treatment and counseling, but failed to consistently attend appointments and eventually was unsuccessfully terminated from the programs. The Agency also offered for Amber to participate in Family Dependency Treatment Court, but Amber declined. Tom completed the initial assessment for substance abuse treatment, but failed to follow through with the treatment. Both Amber and Tom continued to test positive for heroin and marijuana on screenings.

{¶14} The record indicates that as the case proceeded Amber and Tom stopped using most illegal drugs, but they continued to use marijuana. The caseworker observed this conduct demonstrated a lack of insight into the seriousness of the situation, and a lack of commitment to be fully engaged in the recommended treatment. Amber's and Tom's attendance at counseling sessions were inconsistent, and they only started to more actively participate in their treatment toward the conclusion of the Agency's involvement.

{¶15} Despite their struggles with substance abuse and addiction, the caseworker's notes indicated that both Amber and Tom visited with the children

consistently and their interactions with the children were described as positive. Both parents occasionally demonstrated desired behavior and there were no reports that either parent had been under the influence of illegal drugs while visiting with the children.

*Motion for Permanent Custody*

{¶16} On September 26, 2014, the Agency moved for modification of temporary custody to permanent commitment. As the basis for permanent custody, the Agency alleged that the children had been in its temporary custody for twelve or more months of a consecutive twenty-two-month period; the children could not be placed with either parent within a reasonable amount of time as determined by the analysis of R.C. 2151.414(E)(1)-(2); and permanent custody to the Agency was in the best interest of the children.

{¶17} On January 29, 2015, Amber filed a motion for custody, requesting that Ronald James, the children's maternal grandmother's boyfriend, be designated the legal custodian of the minor children. Amber also requested that the court interview K.M.S. Tom moved for in-camera interviews with each child.

{¶18} A hearing on the matter of permanent custody took place on April 21, July 8, and July 9, 2015. At the time of the April hearing, K.M.S. was ten years old, K.S. was nearly seven years old, and M.C. was nearly three years old. The report of GAL was filed on July 30, 2015, with a recommendation that the children should be placed in the permanent custody of the Agency. (Doc. No. at 162.) The GAL

testified in the case on August 24, 2015. After that, on September 14, 2015, the trial court issued its judgment entry, terminating Amber's and Tom's parental rights and granting permanent custody of the children to the Agency. (Doc. No. at 165.)

{¶19} Amber and Tom appeal, raising the following assignments of error.

*Amber's Assignments of Error*

**1) The trial court erred when it granted permanent custody of the minor children to the State as it was not in the best interest of the children.**

**2) The trial court erred when it granted permanent custody of the minor children to the State when the State failed to make reasonable efforts at reunification.**

**3) The trial court erred when it granted permanent custody of the minor children to the State when the children could have been placed with the biological parents within a reasonable time.**

**4) The trial court erred when it granted permanent custody of the minor children to the State when the children could have been placed with alternative caregivers and said placement would have been in the children's best interest.**

*Tom's Assignments of Error*

**1) The trial court erred by finding that granting permanent custody of Appellant's daughter and his two step-daughters to Appellee was in the best interest of the children.**

**2) Appellee neither made a good faith effort at achieving reunification nor used reasonable efforts to do so.**

**3) The trial court erred in finding that the children could not be placed with their parents within a reasonable period of time or should not be placed with the parents.**

**4) The trial court committed prejudicial error by not ruling on the appropriateness of an alternative placement that would have been in the best interest of the children.**

**{¶20}** Before addressing the particular assignments of error, we summarize the law applicable to this case.

*Summary of Permanent Custody Procedure*

**{¶21}** R.C. 2151.414 contains procedures that protect the interests of parents and children in a permanent custody proceeding. *See In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, ¶ 26 (2014). This section of the Revised Code requires that before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of two prongs of the permanent custody test, as required under R.C. 2151.414(B). *See In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, ¶ 9 (2004). The outline of this test is provided below.

**Permanent Custody Test*: First Prong—R.C. 2151.414(B)(1)**

**{¶22}** The first prong of the test requires a finding by clear and convincing evidence that there exists one of the statutorily-prescribed situations of R.C. 2151.414(B)(1):

> **(a) The child * * * cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.**
>
> **(b) The child is abandoned.**
>
> **(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.**

- 11 -

**(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * * .**

**(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.**

R.C. 2151.414(B)(1).

**Permanent Custody Test*: Second Prong—Best Interest of the Child**

**{¶23}** "If the trial court determines that any provision enumerated in R.C. 2151.414(B)(1) applies," it must proceed to the second prong of the test, which requires the trial court to "determine, by clear and convincing evidence, whether granting the agency permanent custody of the child is in the child's best interest." (*Emphasis sic*.) *In re A.F.*, 3d Dist. Marion No. 9-11-27, 2012-Ohio-1137, ¶ 55; *see* R.C. 2151.414(B)(1). The best interest determination is based on an analysis of R.C. 2151.414(D).

**{¶24}** Under R.C. 2151.414(D)(1), the trial court is required to consider all relevant factors listed in that subdivision, as well as any other relevant factors. *In re H.M.*, 3d Dist. Logan Nos. 8-13-11, 8-13-12, 8-13-14, 2014-Ohio-755, ¶ 27. The factors of R.C. 2151.414(D)(1) include:

**(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**

**(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**

**(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, \* \* \* ;**

**(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;**

**(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.**

R.C. 2151.414(D)(1). Under this test, the trial court considers the totality of the circumstances when making its best interest determination and no single factor is given greater weight than others by the statute. *See In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56 (2006); *In re Z.Y.*, 8th Dist. Cuyahoga No. 86293, 2006-Ohio-300, ¶ 13.

*Standard of Review*

**{¶25}** When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." *Eastley v. Volkman*, 132 Ohio St.3d 328,

2012-Ohio-2179, ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App. 3d 103, 115 (9th Dist. 2001).

**{¶26}** In a permanent custody case, the ultimate question for a reviewing court is "whether the juvenile court's findings * * * were supported by clear and convincing evidence." *In re K.H.*, 119 Ohio St.3d 538, 2008–Ohio–4825, ¶ 43. "Clear and convincing evidence" is: "[T]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *In re Estate of Haynes*, 25 Ohio St.3d 101, 104, (1986).

**{¶27}** In determining whether a trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990). *Accord In re Holcomb*, 18 Ohio St.3d 361, 368 (1985), citing *Cross v. Ledford*, 161 Ohio St. 469 (1954) (Once the clear and convincing standard has been met to the satisfaction of the [trial] court, the reviewing court must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof.). "Thus, if the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent

custody is warranted, then the court's decision is not against the manifest weight of the evidence." *In re R.M., M.M., D.M., B.M.*, 4th Dist. Athens Nos. 12CA43, 12CA44, 2013-Ohio-3588, ¶ 55 (4th Dist.).

**{¶28}** As an appellate court, we neither weigh the evidence nor judge the credibility of witnesses. Our role is to determine whether there is relevant, competent and credible evidence, upon which the fact finder could base its judgment. *In re B.H.*, 5th Dist. Fairfield No. 14-CA-53, 2014-Ohio-5790, ¶ 79. Reviewing courts should accord deference to the trial court's decision because the trial court has had the opportunity to observe the witnesses' demeanor, gestures, and voice inflections that cannot be conveyed to us through the written record. *Seasons Coal Co. v. Cleveland*, 10 Ohio St. 3d 77, 79-80 (1984).

**{¶29}** Once the reviewing court finishes its examination, the court may reverse the judgment only if it appears that the fact-finder, when resolving the conflicts in evidence, " 'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.' " *State v. Thompkins*, 78 Ohio St.3d 380, 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court should find a trial court's permanent custody decision against the manifest weight of the evidence only in the " 'exceptional case in which the evidence weighs heavily against the [decision].' " *Id.*, quoting *Martin* at 175; *accord State v. Lindsey*, 87 Ohio St.3d 479, 483 (2000).

{¶30} With the above standards in mind we proceed to address the issues raised by Amber and Tom on appeal.

{¶31} At the outset we note that Amber and Tom raise similar arguments on appeal, therefore we elect to discuss their corresponding assignments of error together.

### First and Third Assignments of Error

{¶32} In their first assignments of error, Amber and Tom challenge the second prong of the permanent custody test, alleging that the trial court erred in its best interest determination. The third assignments of error concern the first prong of the permanent custody test and allege that the children could have been placed with their parents within a reasonable period of time.

### First Prong of the Permanent Custody Test—R.C. 2151.414(B)(1)

{¶33} As stated above, in order to satisfy the first prong of the permanent custody test, the trial court had to find one of the statutorily-prescribed situations of R.C. 2151.414(B)(1)(a)-(e). The trial court's finding that "[t]he children have continuously been in the temporary custody of the Agency for twelve of the last twenty-two consecutive months" fulfilled R.C. 2151.414(B)(1)(d). (Doc. No. 165 at 9.) Amber and Tom do not dispute this finding, and we find that it is supported by the record.

{¶34} In their third assignments of error, Amber and Tom seem to suggest that the trial court was also required to find that the children could not be placed

with either parent within a reasonable time or should not be placed with the parents. Such a finding would satisfy R.C. 2151.414(B)(1)(a). "But if, as in this case, the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period, then the trial court does not need to consider the first element," which is listed in R.C. 2151.414(B)(1)(a). *In re Elliott*, 7th Dist. Jefferson No. 03JE30, 2004-Ohio-388, ¶ 36; *see also In re J.P.*, 12th Dist. Butler No. CA2011-01-014, 2011-Ohio-3332, ¶ 35; *In re J.C.*, 4th Dist. Adams No. 07CA834, 2007-Ohio-3783, ¶ 20; *In re Damron*, 10th Dist. Franklin No. 03AP-419, 2003-Ohio-5810, ¶ 9 ("The plain language of R.C. 2151.414(B)(1)(a) reveals that this subsection is only triggered when none of the remaining three subsections are triggered.").

**{¶35}** Accordingly, we conclude that the trial court was not required to find that the children could not or should not be placed with the parents within a reasonable period of time. Therefore, any errors alleged with respect to the trial court's failure to make such a finding or to the trial court's analysis of factors of R.C. 2151.414(E), are immaterial.

*Second Prong of the Permanent Custody Test—Best Interest Test under R.C. 2151.414(D)(1)*

**{¶36}** The following evidence was presented to the trial court relative to the best interest consideration in R.C. 2151.414(D)(1).

*Evidence Regarding Amber*

**{¶37}** The Agency presented the testimony of the ongoing caseworker, Jackie Hamilton, who stated that she became involved with the case in February of 2013. At that time, Amber was the primary caretaker of the children. She maintained that from the beginning the Agency's goal was reunification. She also confirmed that the children were permitted to remain in Amber's custody during the first three months the case was open. Ms. Hamilton recalled that one of the case plan objectives was for Amber to complete a mental health assessment within thirty days of the court-stamped date on the case plan. In March 2013, Ms. Hamilton drove Amber to the Marion Area Counseling Center and watched the children in the waiting room so that Amber could comply with that case plan requirement. The recommendations from the assessment were for Amber to attend counseling at least once a month. She was also prescribed medication to treat her depression and anxiety issues. Ms. Hamilton recalled that in May of 2013, the Agency removed the children from Amber's custody because she tested positive for opiates and other drugs.

**{¶38}** The Agency also learned of troublesome behavior exhibited by Amber during the first year of the Agency's involvement. In the fall of 2013, Amber, who lived in government-assisted housing, allowed an individual named "Amigo" to live in her apartment for $50.00 a week. (July 8 &9, 2015, trans. at 138-140). At trial, Amber explained that she did this to earn money for Christmas presents. During the

course of his stay, "Amigo" and his friend "Ray-Ray" began selling drugs out of Amber's home.[4] Amber claimed she lived with Tom while she rented her apartment to these individuals and was unaware of their drug trafficking until she walked in on a sale one morning a few months later. Amber stated she "kicked out" "Amigo" and "Ray-Ray" immediately after discovering their actions in her home. (*Id*. at 139, 141). Amber was later subpoenaed to testified in a federal case against "Amigo" and "Ray-Ray" in Chicago. (*Id*. at 140). Amber admitted to being "on drugs" during this time. (*Id*. at 141).

{¶39} Amber eventually completed the drug and alcohol assessment required by the case plan. Ms. Hamilton assisted Amber in enrolling in some rehabilitation programs in 2014 for opioid addiction. One such program was a clinic under the supervision of Dr. Mark Piacentini. At trial, Lisa Smith, a medical assistant with the program explained that the "recovery group" assisted people suffering from heroin addiction by conducting small group meetings and prescribing either Suboxone or Subutex to assist with the withdraw symptoms from heroin.

{¶40} In order to get a seven-day prescription for the medication, a "patient" must meet the requirements of the program, which included attending regular meetings and passing a urine test. Ms. Smith testified that Amber first came to the program in April of 2014 and continued weekly with the program until July 2014, when she was caught attempting to "cheat" on a drug test by using someone else's

---

[4] Amber did not know the legal names of these individuals.

urine. (April 21, 2015 Trans. at 61). According to Ms. Smith, another medical assistant observed Amber with a bottle of urine during testing. Amber was told that she could continue with the counseling and group meeting components of the program, but no longer would be prescribed medication. Amber stopped attending the program at that time.

{¶41} Ms. Hamilton, the ongoing caseworker, testified that in addition to drug addiction and substance abuse, Amber's struggle with depression and anxiety was another concern specifically addressed in the case plan. She recalled that Amber sporadically attended counseling sessions and eventually stopped going all together. Amber also stopped taking her medications claiming she did not feel like she needed them any longer. This point was corroborated by the testimony of Kasey Bisch, a substance abuse and mental health counselor at Marion Area Counseling Center. Ms. Bisch recalled first seeing Amber in 2014 for depression and anxiety issues. She had developed a treatment plan for Amber which consisted of recognizing triggers, relapse prevention, and anxiety management. Amber was supposed to meet with her at least once month, but was eventually "terminated" from the program later in 2014. Ms. Bisch explained that "termination" occurs when a client is inactive for ninety days. (April 21, 2015 Trans. at 68).

{¶42} Ms. Bisch recalled that Amber came back to the Marion Area Counseling Center to resume treatment in January 2015 after completing an updated assessment. Ms. Bisch outlined some of Amber's treatment goals which included

abstaining from using illegal drugs, continuing with mood stabilization and anxiety management, and meeting with a counselor one to four times a month. At the time of Ms. Bisch's testimony in April of 2015, which was over six months after the Agency filed its motion for permanent custody, Amber had met with her three times in a four-month period and had missed a recent appointment. Ms. Bisch recalled that Amber was again prescribed medication to assist with her mental health issues and had made improvements in handling her anxiety. Amber had also reported that she had abstained from her drug of choice, opiates, but continued to use marijuana.[5]

*Evidence Regarding Tom*

{¶43} With regard to Tom, Ms. Hamilton, the ongoing caseworker, testified that his drug use was the Agency's primary concern. She explained that in the beginning the children were removed from Amber, the primary caregiver, which is why the initial case plan only addressed her. Tom was subsequently identified as M.C.'s father and considered to be the children's secondary caregiver. However, it was later discovered that Tom was also using illegal drugs—i.e., heroin and marijuana. Tom also failed to comply with the "safety plan" put in place by the Agency by permitting Amber to have unsupervised contact with the children.

---

[5] Throughout the trial court proceedings, Amber attempted to justify her marijuana use by claiming it alleviated her anxiety issues. However, the record suggests that when Amber did attend the counseling center, professionals there made several attempts to find the right prescription medications to address her anxiety, which she reported to be debilitating at times, but Amber failed to consistently attend counseling to follow up on the effectiveness of the medications and instead made the decision to stop taking them all together.

**{¶44}** In 2014, Tom was convicted of attempted assault based upon an incident with one of Amber's acquaintances. (July 8 & 9, 2015 trans. at 155, 262-63.) Tom had learned that this individual reported his and Amber's continued use of heroin to the Agency. (*Id*. at 262). Tom "chased" down this individual to "beat him up," but law enforcement was called to intervene before Tom could carry through on his threat. (*Id*. at 263). The charge and resulting conviction ensued from this incident.

**{¶45}** Despite the clear directives in the case plan, Tom did not complete a drug and alcohol assessment until April of 2014—over a year after the case was initiated. However, Tom did not return to the Marion Area Counseling Center until January 2015, when he met with Heidi Walter, who assisted him in devising a treatment plan. According to Ms. Walter, and the written plan signed by Tom, Tom was to meet with her one to four times a month. At the time of the hearing in April of 2015, Tom had only met with her once in March 2015. Ms. Walter observed in her report that Tom appeared highly motivated to become heroin free to gain custody of the children. However, she also noted Tom expressed hope that marijuana would be legalized soon and his intent to continue to use marijuana from time to time if the children came to live with him.

**{¶46}** Amber's and Tom's continued marijuana use was confirmed by drug screens which were administered throughout the case. The last drug screens were given during the permanent custody hearing in July 2015. Both Amber and Tom

tested positive for marijuana. Ms. Hamilton, the ongoing caseworker, testified that Amber's and Tom's failure to stop using illegal drugs, specifically marijuana, was a major factor in the Agency's decision to file for permanent custody of the children given their history with struggling with addiction—which notably was the initial cause of the children's removal from Amber's home. She also expressed concerns about the length of time the children had been out of Amber's home, the time it had taken Amber and Tom to take treatment seriously, and the children's need for secure permanent placement as additional reasons supporting the Agency's motion for permanent custody.

*Evidence Pertaining to the Children's Placements*

**{¶47}** The evidence presented regarding the children's custodial history during the pendency of the Agency's involvement revealed the following.

**{¶48}** Amanda Fries, clinical counselor at Mid-Ohio Psychological Services, testified that she worked with K.M.S. during the case from September 2013 to February 2015. She recalled seeing K.M.S. every two weeks for an hour session and described the objective was to improve K.M.S.'s destructive behavior at home and at school as well as to decrease her anxiety. According to Ms. Fries, K.M.S. had made progress in reducing her anxiety and in improving her interactions with others.

**{¶49}** Despite efforts to stabilize her destructive behavior, K.M.S. was eventually placed at a state facility, Buckeye Ranch, in March of 2015 because she

continued to struggle in foster care and the Agency thought K.M.S. needed a higher level of care. Lauren Bartholet, K.M.S.'s residential clinician at Buckeye Ranch, testified at the permanent custody hearing. [6] She explained that upon her transfer to the facility, ten-year-old K.M.S. was initially diagnosed by a psychiatrist as having posttraumatic stress disorder and she was also determined to be suffering with disruptive behavior disorder and ADHD. Ms. Bartholet worked with K.M.S. to develop a treatment plan, which included maintaining a highly structured daily routine and group and individual therapy. She explained the goal is to safely transition K.M.S. back into the community and she would need time to reach that objective considering K.M.S.'s history of "struggling in a lower level of care which would be foster care." (April 21, 2015 trans. at 145). She relayed instances in which K.M.S. had to be restrained due to her physical aggression toward the adults and her peers at the facility. Ms. Bartholet explained that K.M.S. is adjusting to the program but "it's very early in the game." (*Id*. at 142). She expressed her belief that Buckeye Ranch is the appropriate placement for K.M.S. for the foreseeable future.

{¶50} K.S. and M.C. remained in two different foster placements. At the time of the April 21, 2015 hearing, K.S. was six years old and had been in the care of Jessie and Tammy Glen since January 2014. The Glens both testified to their strong bond with K.S. They also had a one-and-a-half-year-old child in the home

---

[6] The testimony of Ms. Bartholet was presented during the April 21, 2015 hearing, five to six weeks after K.M.S.'s transfer to Buckeye Ranch.

who had bonded well with K.S. They recalled K.S. having to repeat Kindergarten, but reported that she is now doing very well in school. Mrs. Glen testified to transporting K.S. to visitations with Amber and Tom at the Agency and noted that K.S. had a good bond with them. The Glens both acknowledged that K.S. refers to Tom as "daddy." (April 21, 2015 Trans. at 183, 189-90). Mr. Glen stated K.S. tells them "on a regular basis that she wants to see her mom but wants to stay with us." (*Id.* at 182-83). Both foster parents also expressed a desire to adopt K.S. if the Agency were to be granted permanent custody of K.S.

{¶51} Melissa Farnsworth, three-year-old M.C.'s foster mother, testified that M.C. has been in her care since June of 2013, when M.C. was nine-months old. M.C. is Ms. Farnsworth's first foster child and lives in the home with her five-year-old son, whom she described as acting like M.C.'s "big brother." (April 21, 2015 Trans. at 166). She stated that M.C. is thriving and is developmentally advanced for her age. She also transported M.C. to the Agency for visitation with Amber and Tom and noted that M.C. is excited to see them. She expressed a willingness to adopt M.C. if the Agency were to be granted permanent custody of M.C.

*Guardian Ad-Litem*

{¶52} The GAL also provided testimony expressing concerns with Amber's ability to parent the children due to her mental health issues and both parents' lack of consistent attendance at counseling and continued illegal drug use. Specifically, the GAL noted in her report that according to Amber's psychological and parenting

assessment performed at Mid-Ohio Psychological Services in June 2014, Amber "evidences deficits with effective problem solving, coping, and interpersonal relationship skills, which are critical to effective parenting." (Doc. No. 153 at 5). Amber was further described as "likely to have difficulty consistently and effectively parenting her children long-term." (*Id.*) To address these concerns, Amber was identified as needing individual counseling to improve her parenting skills and her own mental health. The GAL's report also noted that the assessment observed that Amber's mental health concerns "coupled with continued substance abuse * * * negatively affects her ability to place her children's needs above her own." (*Id*).

{¶53} The GAL noted Tom's consistent employment and appropriate housing reflected positively upon him, but concerns with Tom's criminal history, which included a recent attempted assault conviction and past convictions for drug-related offenses overshadowed those considerations. She was also troubled by the fact that Tom failed to follow through with the counseling recommendations and continued his marijuana use.

{¶54} With regard to K.M.S., the GAL noted that she had changed living environments six times during the case mostly because caregivers were unable to manage her behaviors, which consisted of lying, harming other children, defiant behavior and refusal to follow rules. The GAL noted that K.M.S. had similar behavioral issues in school, which resulted in a suspension for choking another

student. In her report, the GAL recited that K.M.S. had been diagnosed with anxiety disorder, disruptive behavioral disorder and parent-child relational problem as well as ADHD. The GAL observed that K.M.S. is showing improvement at her current placement at Buckeye Ranch.

{¶55} As for K.S., the GAL noted that she also displayed behavioral issues, which resulted in her removal from her first foster home in January 2014 and placement in the Glen's home where she resided at the time of the permanent custody hearing. According to the GAL's report, K.S. was diagnosed with ADHD and had to repeat her Kindergarten school year. Specifically, K.S. was tested her first year of Kindergarten, the 2013-2014 school year, and determined to be functioning mentally and emotionally at the level of a three-year-old. However, during her second Kindergarten year, the GAL noted that K.S. showed "significant improvement and will be progressing to the next grade level." (*Id.* at 8). According to the GAL, the Glens have provided K.S. with a stable environment where her needs are met and she is thriving there. They have also expressed a willingness to continue to care for K.S. and adopt her.

{¶56} The GAL testified that the youngest, M.C., had been in her current placement for over two years and by all accounts is developmentally on target and does not appear to have any lingering effects from being born premature and positive for THC (marijuana) and oxycodone. The GAL observed that Ms.

Farnsworth has provided M.C. with a stable environment where her needs are met and has also expressed a willingness to continue to care for M.C. and to adopt her.

**{¶57}** Regarding the children's wishes the GAL relayed her conversations with K.M.S. in which she expressed a desire to be with Amber while acknowledging that her "mom's the one who got us into this mess." (Doc. No. 135 at 8). The GAL also testified that K.M.S. wanted Amber to "do what she needs to get her back." (August 24, 2015 trans. at 37). The GAL determined that K.S.'s and M.C.'s wishes were difficult to ascertain because they do not understand the situation. However, based upon her experience as the GAL for the children for over two years, the children's need for secure and permanent placement, and her concerns with Amber and Tom being able to appropriately parent the children, the GAL opined that it is in the best interest of the children for the trial court to grant the Agency's motion for permanent custody.

**{¶58}** After the presentation of evidence at the permanent custody hearing, the trial court discussed on the record the motions filed by Amber and Tom requesting the trial court to conduct an in-camera interview of the children. The trial court expressed concerns with conducting an in-camera interview with K.M.S. due to her ongoing emotional struggles and worried about disturbing the progress gained in her current placement and causing her to have a setback. As for M.C., the trial court concluded the three-year-old lacked sufficient maturity and reasoning ability to provide the Court with appropriate responses to assist in its consideration

of the custody matter. The trial court then announced it would conduct an in-camera interview of K.S. as part of its determination of the permanent custody motion.

*Determinations of the Trial Court*

{¶59} In its judgment entry granting the Agency's motion for permanent custody, the trial court found "by clear and convincing evidence that it is in the best interest of the children that they be committed to the permanent custody of Marion County Children Services in accordance with Ohio Revised Code § 2151.414(D)(1)(d) and § 2151.414(E)(1) and (2)." (Doc. No. 165 at 9-10).

{¶60} The trial court discussed the children's current placement at the time of the permanent custody hearing and the progress they made in overcoming developmental and behavioral obstacles while in those placements since their removal from Amber's home. *See* R.C. 2151.414(D)(1)(a). The trial court acknowledged that Amber and Tom maintained their bond with the children through attending visitations. The evidence at the permanent custody hearings also demonstrated that K.S. and M.C. had bonded well with their foster families and that K.M.S. was receiving the appropriate level of care and treatment at Buckeye Ranch.

{¶61} The trial court noted in its judgment entry that it interviewed K.S. and "determined that she lacks the maturity and reasoning ability to express her wishes and concerns." (Doc. No. 165 at 5). As previously mentioned, the trial court stated on the record its reasons for deciding not to interview K.M.S. and M.C. to ascertain their wishes. However, the trial court reviewed the both the testimony and the report

of the GAL as part of its determination under R.C. 2151.141(D)(1)(b), which directs the court to consider the "wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child." The trial court further considered the fact that "the children have continuously been in the temporary care of the Agency for twelve of the last twenty-two consecutive months" and cited to R.C. 2151.414(D)(1)(c). (Doc. No. 165 at 9).

**{¶62}** The trial court also considered the children's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency. *See* R.C. 2151.414(D)(1)(d). The trial court heard extensive evidence which indicated Amber's and Tom's failure to follow through with the case plan objectives that required them to attend counseling for mental health issues and to seek treatment for addiction and substance abuse. The trial court noted Amber "lacks the coping skills to deal with [K.M.S's] behaviors," which the record suggested was exacerbated by Amber's anxiety issues. (Doc. No. 165 at 4.). The trial court acknowledged that Tom had maintained employment and appropriate housing during the trial court proceedings, but also noted that those positive attributes were outweighed by Tom's "continued use of marijuana [which] jeopardizes his successful rehabilitation, his job, and his ability to provide a safe home" for the children. (*Id*. at 9). The evidence before the trial court also demonstrated that the Agency considered numerous relative placements, but none were sustainable options for the children. Moreover, the trial court

considered the recommendations of the GAL that the children were in need a legally secure placement, which could only be fulfilled by granting the Agency's motion for permanent custody.

**{¶63}** In addition to the best interest factors listed in R.C. 2151.414(D)(1), the trial court also considered the factors in R.C. 2151.414(E)(1) and (2). *See* R.C. 2151.414(D)(1)(stating the "trial court shall consider all relevant factors, including, but not limited to," the enumerated factors). Sections 2151.414(E)(1) and (2) of the Revised Code address factors for the trial court to consider in finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. Although the trial court was not required to make this finding relative to its determination under the first prong of the permanent custody test in R.C. 2151.414(B)(1) because the children had been in the temporary custody of the Agency for twelve of the last twenty-two consecutive months, the trial court was nevertheless permitted to use these factors, and *any other relevant factor*, in its permanent custody determination. These two factors state:

> **(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.**

**(2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;**

R.C. 2151.414(E)(1) and (2).

{¶64} On appeal, Amber and Tom attempt to oversimplify the record by arguing that the trial court's decision to grant the Agency's motion for permanent custody was solely based upon their continued marijuana use. However, this argument ignores the extensive evidence present in the record and discussed at length in this opinion of Amber's and Tom's failure to utilize the resources provided to them by the Agency and their decision to prioritize their use of illegal drugs over the best interest of the children, which was the primary cause of the children's removal from their home. Amber and Tom both assert that the caseworker approved of their marijuana use and appear to claim that they are now being unfairly punished for it.

{¶65} To the contrary, the record demonstrates the ongoing caseworker attempted to reduce the initial pressure on Amber and Tom, both self-admitted drug addicts, to cease the use of all illegal substances at once and instead allowed them to focus on stopping one drug at a time, with heroin being the obvious greater addiction concern. Even giving Amber and Tom the benefit of the doubt that they misunderstood the Agency's position on their marijuana use, the testimony at the

April 21, 2015 hearing clearly indicated that their continued marijuana use was a major concern and created of high risk of relapse due to their addiction history. Notwithstanding this fact, both Amber and Tom tested positive for marijuana three months later at another permanent custody hearing, undermining their claims of their willingness to stop smoking marijuana to regain custody of the children.[7]

{¶66} A review of the record shows that there is competent and credible evidence regarding each of the factors set forth in R.C. 2151.414(D) to support the trial court's conclusion that it would clearly and convincingly be in the best interest of the children to terminate the parental rights of Amber and Tom. The determination as to whether to terminate parental rights is left to the discretion of the trial court. *In re H.M.*, 3d. Dist. Logan Nos. 8–13–11, 8–1312, 8–13–13, 2014–Ohio–755. As long as there is competent credible evidence to support the judgment by clear and convincing evidence, the appellate court shall affirm the judgment of the trial court. *Id.* at ¶ 26. The evidence in this case indicates that the trial court's judgments are clearly and convincingly supported by competent and credible evidence. Therefore, the Amber's and Tom's third assignments of error are overruled.

---

[7] Amber's and Tom's credibility pertaining to their willingness to stop using marijuana was also tainted by the fact that they repeatedly claimed marijuana would eventually become legal and thus minimized the effect an addiction to any substance could have on their ability to parent and/or on the children's well-being.

*Second Assignments of Error*

**{¶67}** In their second assignments of error, Amber and Tom argue that the Agency did not make a good faith effort or use reasonable efforts to reunify them with the children. The Ohio Revised Code imposes a duty on the part of children services agencies to make reasonable efforts to reunite parents with their children where the agency has removed the children from the home. R.C. 2151.419; see, also, *In re Brown*, 98 Ohio App.3d 337, 344 (3d Dist.1994). Further, the agency bears the burden of showing that it made reasonable efforts. R.C. 2151.419(A)(1). "Case plans are the tools that child protective service agencies use to facilitate the reunification of families who * * * have been temporarily separated." *In re Evans*, 3d Dist. Allen No. 1-01-75, 2001-Ohio-2302, * 3.

**{¶68}** To that end, case plans establish individualized concerns and goals, along with the steps that the parties and the agency can take to achieve reunification. *In re Evans* at * 3. Agencies have an affirmative duty to diligently pursue efforts to achieve the goals in the case plan. *Id.* "Nevertheless, the issue is not whether there was anything more that [the agency] could have done, but whether the [agency's] case planning and efforts were reasonable and diligent under the circumstances of this case." *In re Leveck*, 3d Dist. Hancock Nos. 5-02-52, 5-02-53, 5-02-54, 2003-Ohio-1269, ¶ 10. We also note that the statute provides that in determining whether reasonable efforts were made, the child's health and safety is paramount. *See* R.C. 2151.419(A)(1).

**{¶69}** At the outset, we note that the Agency's caseworker assigned to the case testified that the children's reunification with Amber and/or Tom was always the goal. The record demonstrates that the children were removed from Amber's home because she was using heroin and other illegal substances in front of the children. It was also revealed through the Agency's involvement that Amber suffered from some mental health issues, which caused her to lack the coping skills needed to be able to parent the children, two of them with behavioral problems. In order to facilitate Amber's reunification with the children, the Agency put specific case plan objectives into effect to address her mental health and substances abuse issues, which she failed to substantially comply with in order to get the appropriate treatment to ameliorate these concerns.

**{¶70}** The record is replete with instances in which the Agency's caseworker, Ms. Hamilton, personally attempted to help Amber meet the case plan objectives, in addition to making the appropriate referral to the treatment and counseling facilities. For example, one of the very first court-ordered requirements was for Amber to have a mental health assessment done within thirty days. Ms. Hamilton drove Amber, who at the was the primary caretaker of the children, to the counseling center and watched the children so that Amber could get the assessment completed.[8]

---

[8] The record indicates that Tom did not appear or participate in the case until the end of April 2013, months after he had been identified as M.C.'s father and served with notice of the ongoing proceedings.

**{¶71}** In addition, Amber testified at the permanent custody hearing that she had not received a regular paycheck in six years. (July 8 & 9, 2015 trans. at 132.) She explained that in addition to receiving food stamps and government housing, Tom supported her financially. (*Id.* at 129-30.) Ms. Hamilton helped Amber apply for social security so that she would have a means to support the children independent of Tom. Ms. Hamilton assisted Amber in filling out the questions on the application and took her to the appointment at the Social Security Administration. Amber was not approved because she needed to complete a psychological evaluation by professional approved by the Social Security Administration. Amber at first attempted to blame Ms. Hamilton for her denial but then admitted she gets "nervous doing that kind of stuff" and is "not good at following up on things." (*Id.* at 129.)

**{¶72}** Ms. Hamilton also drove Amber to several appointments at the two rehabilitation programs to help Amber recover from her heroin addiction. Amber was also offered to participate in the Family Court Dependency Treatment Program, which Amber declined to do. On one occasion after she left work and was on her way home, Ms. Hamilton observed Amber walking home from one of her visitations with the children at the Agency. Ms. Hamilton stopped and offered Amber a ride home, which Amber accepted.

**{¶73}** Ms. Hamilton also testified that the Agency made arrangements for Amber and Tom to have visitation with the children one to two times a week. The

Agency provided bus tickets and cab vouchers for Amber to get back and forth to the visitations, and provided mileage reimbursement to the foster parents for transporting the children to the center. Ms. Hamilton recalled Tom was not always able to visit with the children because he worked second shift and his employer would not accommodate his time off. She arranged special visits with the children while they were out of school at Christmas time so that Tom could visit with them. With regard to Tom, Ms. Hamilton also made the appropriate referral to get him assistance with his drug addiction issue and offered for him to participate in the Family Court Dependency Treatment Program, which he accepted.

{¶74} The record in this case demonstrates that the Agency used reasonable case planning efforts to assist Amber and Tom in achieving the goal of reunification with the children. Accordingly, we find that the Agency's case planning and efforts were reasonable and diligent under the circumstances of this case. Amber's and Tom's second assignments of error are overruled.

*Fourth Assignments of Error*

{¶75} In their fourth assignments of error, Amber and Tom claim the trial court erred when it failed to rule on Amber's motion requesting the trial court designate Ronald James as the legal custodian of the children as an alternative placement to permanent custody. Amber filed this motion four months after the Agency filed for permanent custody of the children.

**{¶76}** At the outset we note that by failing to rule on said motion, the trial court, in effect, denied the motion. *See In re L.M.*, 10th Franklin Dist. Nos. 10AP-445, 10AP-447, 2010-Ohio-5447, ¶ 27; *see also In re J.C., C.C., R.C.*, 10th Franklin Dist. Nos. 09AP-1112, 09AP-1113, 09AP-1114, 2010-Ohio-2422, ¶ 17 (stating "the trial court's failure to rule on [a] motion for custody cannot, by itself, constitute reversible error").

**{¶77}** Moreover, there is no requirement that a trial court find by clear and convincing evidence that a relative is an unsuitable placement option prior to granting permanent custody to an agency. *In re Dylan B.*, 5th Dist. Stark No.2007-CA-00362, 2008-Ohio-2283, ¶ 67, citing *In re Shaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, at ¶ 64 *In re S.E.*, 12th Dist. Clermont No. CA2008-05-045, 2008-Ohio-5300, ¶ 26, citing *In re Lewis*, 4th Dist. Athens No. 01CA20, 2001-Ohio-2618, *9 (Nov. 7, 2001). Indeed, the statutory duty imposed by R.C. 2151.414(B)(1) does not require a trial court to determine by clear and convincing evidence that the termination of a parent's rights is the only option. *In re Shaefer*, at ¶ 64. Instead, the statute requires the trial court to find the "best option" for the child once a determination is made under to R.C. 2151.414(B)(1). *Id*. "The statute does not make the availability of a placement that would not require a termination of parental rights an all-controlling factor." *Id*.

**{¶78}** Here, the record reflects that Ronald James is the paramour of Amber's mother. The Agency's caseworker arranged to visit Mr. James' home to

assess the appropriateness of the placement. However, Mr. James cancelled the appointment because the furnace was not working and never rescheduled the home visit.

{¶79} The GAL experienced similar trouble arranging a visit of Mr. James' home. The day before the first permanent custody hearing, Mr. James contacted her to reschedule the visit. The GAL completed the home visit on May 22, 2015 and concluded that the home was not ready to have three young children live there. She expressed concerns over where the children would sleep. Mr. James' home had previously been a duplex and the upstairs bedrooms where the children were to stay did not have access from the interior of the home. Rather, in order to access the upstairs level, it was necessary to use an outdoor stairway and enter another door, which did not have a door knob, but just a deadbolt lock and a handle. The GAL did not observe any beds for the children and noticed obscenities written on the walls of the bedrooms. At the July permanent custody hearing, Mr. James had yet to remedy these issues to make the home habitable and safe for the children.

{¶80} Moreover, Mr. James acknowledged that he was not familiar with K.M.S.'s specific behavioral issues or the precise reasons for her treatment at Buckeye Ranch. The GAL worried that Mr. James may become overwhelmed with the three children and their corresponding issues. The GAL also noted that another person living in Mr. James' home, Amber's mother, had a criminal history including convictions for theft, possession of cocaine, and misuse of credit cards. The GAL

outlined these concerns in her report and recommended that legal custody should not be granted to Mr. James. Based on the foregoing, we conclude that Amber and Tom failed to demonstrate they suffered any prejudice as a result of the trial court's failure to specifically rule upon the appropriateness of the children's placement with Mr. James. Accordingly, Amber's and Tom's fourth assignments of error are overruled.

{¶81} For all these reasons, the assignments of error are overruled and the judgments are affirmed.

*Judgments Affirmed*

**PRESTON, J. concurs.**

**WILLAMOWSKI, J. DISSENTS**

{¶82} I dissent from the majority opinion and would remand the matter to the trial court for further findings. In order to terminate parental rights, the trial court is required to find 1) the child cannot or should not be placed with either parent within a reasonable time; 2) the child is abandoned; 3) the child is orphaned without relatives who can take permanent custody; 4) the child has been in the temporary custody of the agency for at least 12 of a consecutive 22 month period; or 5) the parent(s) have already lost custody of another child on three separate occasions. R.C. 2151.414(B)(1). Once one of these findings has been made, the trial court must then make a determination as to whether the termination of parental rights is in the child's best interest as set forth in R.C. 2151.414(D). The trial court must consider all relevant factors before it can terminate parental rights.

- 40 -

**{¶83}** This court has previously held that "in rendering its judgment, the trial court must either specifically address each of the required considerations set forth in R.C. 2151.414(D) in its judgment entry, or otherwise provide some affirmative indication in the record that the court has considered the specific factors listed in R.C. 2151.414(D)." *In re D.H.*, 3d Dist. Marion No. 9-06-57, 2007-Ohio-1762, ¶ 21. We held that to meet this obligation the trial court has to, at minimum, cite to the appropriate statute to demonstrate "that the R.C. 2151.414(D) factors were considered." *In re M.R.*, 3d Dist. Defiance No. 4-12-18, 2013-Ohio-1302, *accord In re A.M.*, 3d Dist. Marion No. 9-14-46, 2015-Ohio-2740, ¶ 18. Additionally, "the judgment entry must identify the clear and convincing evidence that supports a finding that each factor was considered." *In re H.M.*, 3d Dist. No. 8-13-11, 2014-Ohio-755, 9 N.E.3d 470, ¶ 28, citing *In re McMillin*, 171 Ohio App.3d 686, 2007-Ohio-2046, 872 N.E.2d 975, ¶ 14-15 (reversing a grant of permanent custody to the agency where "nothing in the judgment entry indicate[d] that the trial court specifically addressed each of the required considerations in R.C. 2151.414(D)," and the trial court failed to "provide any affirmative indication in the record that it considered the specific factors in that section," even though many of the factual findings recited in the judgment entry were "arguably" relevant to the best interest determination).

> **[I]t is not the prerogative of the appellate court to "review the factual record or narrative and then make the necessary inferences to determine whether the trial court must have considered each of the required statutory factors." Instead, the**

> **judgment entry must identify the clear and convincing evidence that supports a finding that each factor was considered.**

*In re H.M., supra* at ¶ 28 quoting *In re D.H., supra* at ¶ 20. The function of this court is not to determine whether the trial court could possibly have made the required findings based upon the record; it is the job of the trial court to make factual findings. Our task is to make sure that the trial court made the findings as required by law.

**{¶84}** Here, there is no dispute that the children had been in the permanent custody of the agency for more than 12 months in a consecutive 22 month period. Once that finding was made, the trial court was required to consider the statutory factors set forth in R.C. 2151.414(D). A review of the trial court's judgment entry fails to provide any affirmative indication that the specific statutory factors were considered. The only relevant factor expressly mentioned with the best-interest conclusion was factor (d), where the entry stated that the "Court further finds by clear and convincing evidence that it is in the best interest of the children that they be committed to the permanent custody of Marion County Children Services in accordance with [R.C. 2151.414(D)(1)(d) and 2151.414(E)(1),(2)]." Doc. 165. The two R.C. 2151.414(E) factors mentioned by the trial court are not part of the best interest determination under R.C. 2151.414(D)(1). The trial court's citation to only one of the required factors did not satisfy its "minimum" obligation. *See In re M.R., supra* at ¶ 78 (holding that the trial court's obligation was satisfied "albeit to the minimum extent possible" when the trial court cited to the appropriate statute and

- 42 -

there was clear and convincing evidence in the record to support the trial court's findings); *accord In re A.M., supra* at ¶ 18 (upholding the best interest determination where the trial court made findings relevant to the R.C. 2151.414(D) factors and cited the statute in making its best-interest conclusion). From the judgment entry before this court, it appears that some of the required factors may have been either ignored entirely or not given any weight in the best interest determination.

**{¶85}** For example, factor (a) requires the trial court to analyze the interaction and interrelationship of the child and the parents, siblings, and others. The only discussion involved a statement that there was a bond between the children and the parents. Doc. 165 at 5-6. No analysis was provided regarding how the children interacted with siblings or other care-givers. Factor (b) requires the trial court to address the wishes of the children. While the trial court mentioned that one child was unable to express her wishes, it did not address the other two children, one of which was older. The trial court also did not address the wishes of the eldest daughter who indicated through the GAL that she wished to remain with her mother.

**{¶86}** Since the trial court did not specifically address all the statutory factors, did not make findings relevant to the factors, and did not cite the factors in making its best-interest conclusion, it did not comply with the statutory requirements. This court should not be combing through the record to find facts which might support findings if the trial court had made them that will then support the trial court's conclusions. The trial court should be the party to determine the

facts, make the findings, and then make the conclusions based upon the findings. For this reason, I would sustain the first and fourth assignments of error and remand the matter to the trial court for further proceedings.

/hls