[Cite as *In re K.M.*, 2018-Ohio-3711.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## CRAWFORD COUNTY

IN RE:

    K.M.,                             **CASE NO. 3-18-11**

ADJUDGED NEGLECTED CHILD.

                                      **O P I N I O N**

[CHRISTINA LIVELY - APPELLANT]

---

IN RE:

    D.M.,                             **CASE NO. 3-18-12**

ADJUDGED NEGLECTED CHILD.

                                        **O P I N I O N**

[CHRISTINA LIVELY - APPELLANT]

---

**Appeals from Crawford County Common Pleas Court**
**Juvenile Division**
**Trial Court Nos. F-2185024 and F-2185023**

**Judgments Affirmed**

**Date of Decision:    September 17, 2018**

---

**APPEARANCES:**

    *Brian N. Gernert* **for Appellant**

    *Michael J. Wiener* **for Appellee**

**PRESTON, J.**

{¶1} Appellant, Christina Lively ("Lively"), appeals the April 11, 2018 decisions of the Crawford County Court of Common Pleas, Juvenile Division, awarding permanent custody of her minor children, K.M. and D.M., to Crawford County Job and Family Services (the "agency"). For the reasons that follow, we affirm.

{¶2} K.M. and D.M. are the children of Lively and Brandon Milligan ("Milligan"). On February 3, 2017, the agency filed complaints in case numbers C-2175023 and C-2175024 alleging K.M. and D.M., respectively, to be neglected children; the agency also filed a motion for a shelter-care hearing. (*See* Case No. F-2185023, Doc. No. 1); (*See* Case No. F-2185024, Doc. No. 1).[1] On March 10, 2017, Lively admitted that K.M. and D.M. are neglected children, and the trial court found K.M. and D.M. to be neglected children and committed them to the temporary custody of the agency. (*Id.*); (*Id.*). That same day, the trial court approved and adopted the case plans prepared by the agency. (*Id.*); (*Id.*).

---

[1] The records in case numbers C-2175023 and C-2175024 are not before this court. References to dates and descriptions of pleadings and motions, the dispositions of pleadings and motions, case plans, and all other events preceding the filing of the agency's motion for permanent custody are drawn solely from the records in case numbers F-2185023 and F-2185024. Some events, such as when the trial court appointed a guardian ad litem for K.M. and D.M., and certain documentation, such as a document setting forth the precise terms of Lively's case plan, are not included in the records on appeal. Accordingly, the factual and procedural histories of these cases are reproduced here with as much accuracy as permitted by the limited records available to this court.

**{¶3}** On January 30, 2018, the agency filed motions for permanent custody of K.M. and D.M. (*Id.*); (*Id.*). On March 26, 2018, K.M. and D.M.'s guardian ad litem ("GAL") filed his report recommending that the trial court award permanent custody of K.M. and D.M. to the agency. (Case No. F-2185023, Doc. No. 6); (Case No. F-2185024, Doc. No. 7). After a hearing on March 26, 2018, the trial court granted permanent custody of K.M. and D.M. to the agency on April 11, 2018. (Case No. F-2185023, Doc. No. 7); (Case No. F-2185024, Doc. No. 8).

**{¶4}** On May 8, 2018, Lively filed notices of appeal.[2] Lively's appeals were subsequently consolidated for purposes of briefing and argument. She raises one assignment of error.

### Assignment of Error

**Clear and convincing evidence did not exist to justify a finding that it was in the best interests [sic] of the minor children to terminate parental rights and award permanent custody of the minor children to Crawford County Department of Job and Family Services.**

**{¶5}** In her assignment of error, Lively argues that the trial court erred by concluding that clear and convincing evidence supports that it is in the best interest of K.M. and D.M. to grant permanent custody of K.M. and D.M. to the agency. In particular, Lively argues, "Based upon the testimony and evidence provided, the

---

[2] Milligan did not file notices of appeal.

court finding the grant of permanent custody to be well taken is completely without basis." (Appellant's Brief at 4).

{¶6} The right to raise one's child is a basic and essential right. *In re Murray*, 52 Ohio St.3d 155, 157 (1990), citing *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208 (1972) and *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625 (1923). "Parents have a 'fundamental liberty interest' in the care, custody, and management of the child." *Id.*, quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388 (1982). However, the rights and interests of a natural parent are not absolute. *In re Thomas*, 3d Dist. Hancock No. 5-03-08, 2003-Ohio-5885, ¶ 7. These rights may be terminated under appropriate circumstances and when the trial court has met all due process requirements. *In re Leveck*, 3d Dist. Hancock Nos. 5-02-52, 5-02-53 and 5-02-54, 2003-Ohio-1269, ¶ 6.

{¶7} "R.C. 2151.414 outlines the procedures that protect the interests of parents and children in a permanent custody proceeding." *In re N.R.S.*, 3d Dist. Crawford Nos. 3-17-07, 3-17-08 and 3-17-09, 2018-Ohio-125, ¶ 12, citing *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, ¶ 26. "When considering a motion for permanent custody of a child, the trial court must comply with the statutory requirements set forth in R.C. 2151.414." *In re A.M.*, 3d Dist. Marion No. 9-14-46, 2015-Ohio-2740, ¶ 13, citing *In re C.E.*, 3d Dist. Hancock Nos. 5-09-02 and 5-09-03, 2009-Ohio-6027, ¶ 14. "R.C. 2151.414(B)(1) establishes a two-part test for

courts to apply when determining whether to grant a motion for permanent custody: (1) the trial court must find that one of the circumstances in R.C. 2151.414(B)(1)(a)-(e) applies, and (2) the trial court must find that permanent custody is in the best interest of the child." *In re Y.W.*, 3d Dist. Allen No. 1-16-60, 2017-Ohio-4218, ¶ 10, citing *In re S.G.*, 9th Dist. Wayne No. 15AP0005, 2015-Ohio-2306, ¶ 10 and *In re Brown*, 98 Ohio App.3d 337, 343 (3d Dist.1994). R.C. 2151.414(B)(1) provides, in relevant part, that a trial court

> may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to [R.C. 2151.414(A)], by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that * * *:
>
> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

R.C. 2151.414(B)(1)(a). "Specifically concerning R.C. 2151.414(B)(1)(a), '[i]f one or more of the factors enumerated in R.C. 2151.414(E) is found to be present by

clear and convincing evidence, the trial court shall find that the child cannot be placed with the parents within a reasonable period of time or should not be placed with the parents.'" *In re A.M.* at ¶ 13, quoting *In re A.F.*, 3d Dist. Marion No. 9-11-27, 2012-Ohio-1137, ¶ 54, citing *In re Goodwin*, 3d Dist. Shelby No. 17-08-12, 2008-Ohio-5399, ¶ 23.

{¶8} R.C. 2151.414(E) provides, in relevant part:

In determining at a hearing held pursuant to [R.C. 2151.414(A)] * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to [R.C. 2151.414(A)] * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions

causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

* * *

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child[.]

R.C. 2151.414(E)(1), (4).

{¶9} "'If the trial court determines that any provision enumerated in R.C. 2151.414(B)(1) applies,' it must proceed to the second prong of the test, which requires the trial court to 'determine, by clear and convincing evidence, whether granting the agency permanent custody of the child is in the child's best interest.'" *In re K.M.S.*, 3d Dist. Marion Nos. 9-15-37, 9-15-38 and 9-15-39, 2017-Ohio-142, ¶ 23, quoting *In re A.F.* at ¶ 55 and citing R.C. 2151.414(B)(1). "The best interest determination is based on an analysis of R.C. 2151.414(D)." *Id.*

{¶10} "Under R.C. 2151.414(D)(1), the trial court is required to consider all relevant factors listed in that subdivision, as well as any other relevant factors." *Id.* at ¶ 24, citing *In re H.M.*, 3d Dist. Logan Nos. 8-13-11, 8-13-12 and 8-13-13, 2014-Ohio-755, ¶ 27. The R.C. 2151.414(D)(1) factors include:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1). "Under this test, the trial court considers the totality of the circumstances when making its best interest determinations. No single factor is given more weight than others." *In re N.R.S.*, 2018-Ohio-125, at ¶ 16, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56.

{¶11} If the trial court makes these statutorily required determinations, a reviewing court will not reverse a trial court's decision unless it is not supported by clear and convincing evidence. *In re H.M.K.*, 3d Dist. Wyandot Nos. 16-12-15 and 16-12-16, 2013-Ohio-4317, ¶ 43, citing *In re Meyer*, 98 Ohio App.3d 189, 195 (3d Dist.1994), citing *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985) and *In re Adoption of Lay*, 25 Ohio St.3d 41, 42 (1986). "Clear and convincing evidence is that which is sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *In re S.G.*, 2015-Ohio-2306, at ¶ 10, citing *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶12} At this point, we note that Lively does not argue that the trial court erred by determining that one of the provisions of R.C. 2151.414(B)(1) applies to K.M. and D.M. Instead, Lively argues only that the trial court erred by concluding that it is in K.M.'s and D.M.'s best interest to award permanent custody of K.M. and D.M. to the agency. Thus, we will address only whether the trial court erred by concluding, by clear and convincing evidence, that the R.C. 2151.414(D)(1) factors

weigh in favor of granting permanent custody of K.M. and D.M. to the agency. *See In re Christopher G.*, 6th Dist. Lucas No. L-06-1188, 2006-Ohio-6294, ¶ 16.

{¶13} We further note that many of the trial court's factual findings relate to its conclusion under R.C. 2151.414(B) and 2151.414(E) that K.M. and D.M. could not be placed with Lively within a reasonable time or that K.M. and D.M. should not be placed with Lively. (*See* Case No. F-2185023, Doc. No. 7); (*See* Case No. F-2185024, Doc. No. 8). However, it is evident that the trial court also considered the R.C. 2151.414(E) factors in determining whether it is in K.M.'s and D.M.'s best interest to grant permanent custody to the agency and that the trial court afforded these factors great weight in concluding that permanent custody is in K.M.'s and D.M.'s best interest. *See In re K.M.S.*, 2017-Ohio-142, at ¶ 63 ("[T]he trial court was * * * permitted to use [the R.C. 2151.414(E)] factors, and *any other relevant factor*, in its permanent custody determination.") (Emphasis sic.). Therefore, the trial court's findings supporting its conclusion that Lively "continuously failed to substantially remedy the conditions causing [K.M. and D.M.] to be placed outside the home" and that she "demonstrated a lack of commitment toward [K.M. and D.M.]" are also relevant to its conclusion that permanent custody is in K.M.'s and D.M.'s best interest. (Case No. F-2185023, Doc. No. 7); (Case No. F-2185024, Doc. No. 8).

{¶14} In its judgment entries awarding permanent custody of K.M. and D.M. to the agency, the trial court concluded that "it is in the best interests [sic] of [K.M. and D.M.] to provide [them] with a stable nurturing environment from another home and family." (*Id.*); (*Id.*). In addition, the trial court concluded "by clear and convincing evidence * * * that considering the factors established in O.R.C. Sec. 2151.414(D) * * * it would be in the best interests [sic] of [K.M. and D.M.] to grant permanent custody to Job [and] Family Services." (*Id.*); (*Id.*).

{¶15} In support of its conclusion that it is in the best interest of K.M. and D.M. to award permanent custody of K.M. and D.M. to the agency, the trial court found that a "presenting problem" that resulted in K.M. and D.M.'s removal from Lively's custody was "parental substance abuse" and that "[Lively] had lost her job the previous July and was essentially homeless and was suffering depression and anxiety over the situation." (*Id.*); (*Id.*). The trial court found that, to remedy these problems, the agency instituted a case plan requiring Lively to complete mental-health and substance-abuse evaluations, together with any recommended counseling, submit to random drug screens, and have drug-free screens for a minimum period of six months. (*Id.*); (*Id.*). The trial court also found that the case plan required Lively to obtain and maintain a suitable source of income and secure an "appropriate, independent, clean and hazard free home with working utilities for a minimum of ninety days." (*Id.*); (*Id.*).

{¶16} Yet, the trial court found that Lively failed to satisfy most of the case plan's objectives.  The trial court noted that Lively "had not been fully cooperative" with the drug-counseling recommendations "as she had missed counseling sessions and refused drug screens for [sic] the counselor."  (*See id.*); (*See id.*).  The trial court also found that Lively was ultimately discharged from drug counseling without successfully completing the program.  (*Id.*); (*Id.*).  The trial court observed that Lively was unable to screen negative for drugs for six months and that her most recent drug screen on January 18, 2018 was positive for cocaine and fentanyl.  (*Id.*); (*Id.*).  Furthermore, the trial court found that although Lively was able to attain employment at Carton Services, she was fired in November 2017 and did not report substitute employment.  (*Id.*); (*Id.*).  Moreover, the trial court found that while "[Lively] did obtain independent housing in August 2017, * * * the case worker [was] unable to confirm utilities are working and rent is paid-up despite multiple monthly attempts at home visits since August."  (*Id.*); (*Id.*).

{¶17} In addition, the trial court found that "[Lively's] visitations [with K.M. and D.M.] have been somewhat sporadic" and that Lively missed seven visitations and arrived late to or left early from others.  (*Id.*); (*Id.*).  The trial court also noted that Lively failed to appear at the permanent-custody hearing "as she was incarcerated in the Huron County Jail and not at liberty to appear."  (*Id.*); (*Id.*).

**{¶18}** With respect to R.C. 2151.414(D)(1)(d), the trial court found that there were no viable alternative long-term placements in lieu of permanent custody. (*See id.*); (*See id.*). The trial court stated that Lively suggested placing K.M. and D.M. with Thad Stumbo ("Stumbo"), a man she met while working for Carton Services. (*Id.*); (*Id.*). However, the trial court found that Stumbo "has a cluttered one bedroom apartment, has not completed a records check, has no experience caring for children and does not really recall ever meeting [K.M. and D.M.]" (*Id.*); (*Id.*). In addition, the trial court found that "[Lively's mother] suggested consideration of [Lively's brother], who happens to be married to [Milligan's] sister, but a FACSIS check revealed the couple have a child welfare case history that excludes them." (*Id.*); (*Id.*). The trial court also found that Milligan had "not participated in accomplishing the Case Plan goals and objectives for placement." (*Id.*); (*Id.*).

**{¶19}** Clear and convincing evidence supports the trial court's conclusion that it is in K.M.'s and D.M.'s best interest to grant permanent custody of K.M. and D.M. to the agency. With respect to the R.C. 2151.414(E) factors that served as other "relevant factors" under R.C. 2151.414(D)(1), the record establishes that Lively failed continuously and repeatedly to substantially remedy the conditions that caused K.M. and D.M. to be removed from her custody. *See* R.C. 2151.414(E)(1). The record further shows that Lively demonstrated a lack of commitment to K.M. and D.M. by failing to regularly support or visit with K.M.

and D.M. and that she exhibited an unwillingness to provide an adequate permanent home for K.M. and D.M. *See* R.C. 2151.414(E)(4). At the beginning of the March 26, 2018 permanent-custody hearing, Lively's attorney requested a "brief continuance" because Lively was "incarcerated in the Huron County Jail." (Mar. 26, 2018 Tr. at 5). The agency objected to the request for a continuance on grounds that "[Lively] * * * [was] incarcerated due to a substance abuse concern" and that the "permanent custody motion and the underlying case stems from substance abuse concerns." (*Id*. at 6). The agency further argued that because K.M. and D.M. had "been in the custody of the agency * * * [for] over a year," they needed "permanency" and thus "a continuance [was] not appropriate." (*Id.*). The trial court ultimately denied the request for a continuance. (*Id.* at 7).

{¶20} Next, Brook Rachel ("Rachel"), an ongoing caseworker with the agency, testified that K.M.'s and D.M.'s cases were initially opened when "crack pipes [were] found in [D.M.'s] coat pockets." (*Id.* at 9-10). She noted that Lively had a "drug use/substance abuse issue." (*Id.*). Rachel testified that the case plan put in place to remedy those issues required Lively "to complete a mental health assessment and follow recommendations, complete an [Alcohol and Other Drug ("AOD")] assessment and follow recommendations, [and obtain] stable housing and income." (*Id.*). Rachel testified that Lively completed the mental-health assessment and that there were no recommendations; she also testified that Lively completed

the AOD assessment and that it was recommended that she complete drug counseling. (*Id.* at 10-11). However, she stated that Lively was "sporadic" in attending her drug-counseling appointments and that "[s]he would show up for periods of time, and then she would be late to an appointment, or she wouldn't show up to an appointment." (*Id.* at 11). Rachel then identified State's Exhibit 5 as a weekly progress report from the drug-counseling center Lively attended. (*Id.*). (*See* State's Ex. 5). She testified that the report reflects that Lively was "unsuccessfully discharged" from the counseling program due to an arrest. (Mar. 26, 2018 Tr. at 12). (*See* State's Ex. 5).

{¶21} Rachel also testified that, as part of her case plan, Lively was required to maintain a "period of sobriety." (Mar. 26, 2018 Tr. at 12-13). Rachel stated that the agency "complete[d] monthly drug screens or ma[de] attempts to try to get drug screens from [Lively]" in order to monitor her compliance with the sobriety requirement. (*Id.* at 12). She testified that while "[Lively was directed] to test clean for six months," "[s]he [was] unable to do that." (*Id.*). Rachel identified State's Exhibit 6 as Lively's drug screen results. (*Id.* at 13). (*See* State's Ex. 6). The drug screen results reflect that Lively tested positive for tetrahydrocannabinol ("THC"), an active chemical in marijuana, on February 22 and February 27, 2017, positive for cocaine on March 28 and August 28, 2017, and positive for cocaine and fentanyl on January 18, 2018. (*See* State's Ex. 6). Rachel also testified that, at the time of the

permanent-custody hearing, Lively was incarcerated for a probation violation arising from a positive drug screen result and that "[d]uring her urinalysis, she was using somebody else's urine." (Mar. 26, 2018 Tr. at 17-18). She testified that she believed that Lively would be "incarcerated until June, unless they have an opening for a rehab facility." (*Id.* at 18).

{¶22} Rachel testified that Lively secured employment with Carton Services as required by the terms of the case plan. (*Id.* at 14). However, she testified that Lively was fired from Carton Services in November 2017 and that, to the best of her knowledge, Lively had not been employed since November 2017. (*See id.*). While Rachel stated that Lively had secured an apartment, she testified that she had not been inside Lively's apartment since August 2017 despite "many, many attempts, three attempts a month usually." (*Id.*). Rachel remarked that she did not know the then-present condition of Lively's residence. (*Id.* at 15).

{¶23} Rachel then testified about Lively's visitations with K.M. and D.M. (*See id.*). Rachel testified that Lively's visits with K.M. and D.M. had "been somewhat sporadic" and that "some visits [went] very well, and some visits [did not] happen. Some visits [were] inappropriate. There was one incident where * * * [Lively] ended up leaving early, but [K.M. and D.M.'s] foster parent felt that [Lively] was under the influence based on her behaviors during the visit." (*Id.*). Rachel noted that Lively "missed * * * seven visits total" and that there was

"probably about a handful that she was either late to or left early." (*Id.* at 15-16). When asked whether "[Lively] [had] been able to successfully complete the goals and objectives of the case plan" and whether she "believe[d] that there [was] a likelihood that it is reasonable for [Lively] to complete [the case plan] in any time period," Rachel replied, "No." (*Id.* at 18). Rachel testified that she believed that it is in K.M.'s and D.M.'s best interest to "receive permanent custody" and that, in the agency's opinion, there were no options other than permanent custody. (*Id.* at 20).

{¶24} Finally, State's Exhibits 1 and 2, certified copies of Lively's child support payment records, reflect that Lively paid child support on an irregular basis between March 2017 and February 2018 and that as of February 28, 2018, Lively was $3,185.08 in arrears. (*See id.* at 7-8). (*See also* State's Exs. 1, 2).

{¶25} Therefore, as to the R.C. 2151.414(E) factors considered under R.C. 2151.414(D)(1), the record establishes that by failing to obtain stable employment, continuing to use drugs and testing positive for drugs in multiple drug screens, unsuccessfully completing drug-abuse counseling, and failing to allow the agency to assess the quality of her independent housing, Lively failed continuously and repeatedly to substantially remedy the conditions that caused K.M. and D.M. to be removed from her custody. *See* R.C. 2151.414(E)(1). Moreover, Rachel's testimony as to Lively's inconsistent or improper visitations with K.M. and D.M. and Lively's child support payment records reflecting that she was thousands of

dollars in arrears establish that Lively demonstrated a lack of commitment to K.M. and D.M. by failing to regularly support or visit with K.M. and D.M. *See* R.C. 2151.414(E)(4). Finally, Lively's failure to secure reliable employment and doubts over the suitability of her residence demonstrate an unwillingness to provide an adequate permanent home for K.M. and D.M. *See* R.C. 2151.414(E)(4).

{¶26} With respect to R.C. 2151.414(D)(1)(a), the record demonstrates that K.M. and D.M. interact and interrelate well with Lively. The GAL's report states that "[t]here is no doubt that the children have a close relationship with [Lively]." (Case No. F-2185023, Doc. No. 6); (Case No. F-2185024, Doc. No. 7). The report further notes that "[i]f the Court would grant the motion for permanent custody, the children will be seriously affected by this ruling." (*Id.*); (*Id.*). However, the record also suggests some weaknesses in K.M., D.M., and Lively's relationship as reflected by Lively's inconsistent or inappropriate visits with K.M. and D.M. (*See* Mar. 26, 2018 Tr. at 15-16). A parent's inconsistent attendance at scheduled visitations with their children is a relevant consideration when assessing the interaction and interrelationship between minor children and a parent. *See In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 15, 25.

{¶27} In regard to R.C. 2151.414(D)(1)(b)—K.M.'s and D.M.'s wishes— the GAL's report unambiguously reflects that K.M. and D.M. "would like to return to [Lively's] care." (*See* Case No. F-2185023, Doc. No. 6); (*See* Case No. F-

2185024, Doc. No. 7). However, K.M.'s and D.M.'s clear wishes, by themselves, did not require the trial court to deny the agency's motion for permanent custody. *In re S.M.*, 4th Dist. Highland No. 14CA4, 2014-Ohio-2961, ¶ 36. Rather, K.M.'s and D.M.'s wishes were simply "a factor for the trial court to weigh along with others outlined in R.C. 2151.414(D)(1)." *Id.*, citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 57.

{¶28} Concerning R.C. 2151.414(D)(1)(c)—K.M.'s and D.M.'s custodial histories—Rachel testified that K.M. and D.M. had been in the temporary custody of the agency since February 2017. (*See* Mar. 26, 2018 Tr. at 20, 29). (*See also* Case No. F-2185023, Doc. No. 1); (*See also* Case No. F-2185024, Doc. No. 1). Thus, the record establishes that K.M. and D.M. had been in the agency's temporary custody for a little less than a year when the agency filed for permanent custody and that they had been in temporary custody for approximately 13 or 14 months at the time of the permanent-custody hearing. *See* R.C. 2151.414(D)(1)(c). In addition, given that Lively was incarcerated at the time of the permanent-custody hearing and that she was going to either remain in jail or be sent to a rehabilitation facility, K.M.'s and D.M.'s period of temporary custody would have continued past the date of the permanent-custody hearing.

{¶29} As to R.C. 2151.414(D)(1)(d)—K.M.'s and D.M.'s need for a legally secure permanent placement and whether that type of placement could be achieved

without a grant of permanent custody to the agency—the record supports the trial court's finding that granting permanent custody to the agency was the only effective means of providing K.M. and D.M. with a legally secure permanent placement. "A legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *In re M.B.*, 4th Dist. Highland No. 15CA19, 2016-Ohio-793, ¶ 56. The record demonstrates that none of the proposed alternatives to permanent custody could provide K.M. and D.M. with a reliably stable, safe, and nurturing home environment.

{¶30} Rachel testified that K.M. and D.M. had been in temporary custody since February 2017. (Mar. 26, 2018 Tr. at 20). She testified that the agency had initially considered placing K.M. and D.M. with Lively's mother and Lively's mother's boyfriend, but that placement with the couple was ultimately deemed inappropriate due to concerns over alcohol and substance abuse. (*Id.*). Rachel also testified that Stumbo, one of Lively's friends whom she met while working at Carton Services, contacted the agency concerning the possibility of placing K.M. and D.M. with him. (*Id.* at 16-17). She testified that, as of the March 26, 2018 hearing, the agency had not completed Stumbo's home-study evaluation and he had not yet provided his fingerprints. (*Id.* at 16). Rachel stated that Stumbo self-reported that "he had had three DUIs," the most recent of which occurred 13 years

earlier. (*Id.*). She testified that Stumbo "stated that he had met [K.M. and D.M.] maybe one time, but it wasn't for a significant amount of time." (*Id.*). Rachel stated that Stumbo had no contact with K.M. and D.M. during the months that K.M. and D.M. were in the temporary custody of the agency. (*Id.* at 17). When asked whether "[b]ased on [her] training and experience," Rachel "believe[d] it to be in [K.M.'s and D.M.'s] best interest to be placed into [Stumbo's] custody should the home study be approved," Rachel responded that she did not believe that placement with Stumbo would be in K.M.'s and D.M.'s best interest. (*Id.*). She testified that her beliefs about the advisability of placement with Stumbo were based on "his history with the DUIs, the fact that [K.M. and D.M.] don't have any relationship with him, and [that] it seems that [Lively] was under the impression that once she were to get out [of jail], that maybe [K.M. and D.M.] could return in the home with her and him living together." (*Id.*).

{¶31} Next, Rachel testified about her contacts with Milligan and the viability of long-term placement with Milligan or members of Milligan's family. (*See id.* at 18-20). Rachel testified:

I * * * had a phone call with [Milligan] in March of [2018] * * *. There was an aunt of [K.M. and D.M.] * * * [whose] name was also given for kinship, but she couldn't be approved because of her past history. And I asked about the father, [Milligan], and she had stated

that he was not able to be reached at [that] time. About a week later,

[Milligan] called me, and he had just gotten out of prison.

(*Id.* at 18). Rachel then described Milligan's efforts to be included on the case plan and to influence K.M. and D.M.'s placement:

[The State]: Have you had contact with [Milligan] about services to be added to the case plan for him or placement of the girls?

[Rachel]: [Milligan] stated that he would be at the hearing today, and he would be requesting a court appointed attorney to get the girls back. I told him, at that point, if he wanted to be on the case plan, we would have to do so some [sic] services in order to get the girls into his home.

[The State]: Did he request them?

[Rachel]: No.

[The State]: Did he show up today?

[Rachel]: No.

[The State]: Has he had any visitation with [K.M. and D.M.] since they've been in placement?

[Rachel]: No.

(*Id.* at 19).  Rachel then opined that, based on her training and experience, she did not believe that it would be appropriate or reasonable to award custody of K.M. and D.M. to Milligan.  (*Id.*).

{¶32} On cross-examination, Rachel testified that Stumbo voluntarily submitted to a drug screen and that the screen showed that he "was negative" for drugs.  (*Id.* at 21).  She testified that she had been to Stumbo's house and that his house was "cluttered."  (*Id.*).  She described Stumbo's home as containing "one bedroom," and she noted that he "[did] not have any beds at [that] time for [K.M. and D.M.]"  (*Id.*).  However, Rachel admitted that Stumbo's house would be "appropriate" "[i]f he were to unclutter it."  (*Id.* at 22).  Rachel testified that Stumbo was still employed by Carton Services.  (*Id.*).  She confirmed that Stumbo disclosed his three DUIs and noted that although DUIs were "not on [the agency's] list of exclusions, * * * [the agency] * * * can take into [account] other considerations." (*Id.*).  She acknowledged that DUI convictions were not "per se" exclusions and that the determination of whether a placement is suitable despite DUI convictions is a "county-by-county decision."  (*Id.*).  Rachel testified that she ran Stumbo "through the SACWIS Program" and that he did not have any prior involvement with Children Services that would automatically exclude him from accepting a placement through the agency.  (*Id.* at 22-23).  Finally, she testified that Stumbo did everything

necessary to "complete [the agency's] background" and that there were no issues. (*Id.* at 24-25).

{¶33} Next, K.M. and D.M.'s GAL questioned Rachel regarding her knowledge of Lively and Stumbo's relationship. (*See id.* at 25-26). Rachel testified that she did not know whether Lively and Stumbo's relationship predated Lively's employment at Carton Services and that, because K.M. and D.M. had been in the temporary custody of the agency the entire time that Lively worked at Carton Services, it was unlikely that Stumbo had an opportunity to meet K.M. and D.M. (*Id.* at 26). The GAL asked Rachel whether "[K.M.] has some issues involving learning problems," to which Rachel responded, "Yes." (*Id.*). She agreed that K.M. requires "additional care than what a normal child might need" and testified that from "[t]he information that [she received] from [Stumbo]," Stumbo did not demonstrate "any history of * * * knowing how to * * * work with children that have learning disabilities." (*Id.* at 26-27). Rachel testified that D.M. has "some behavioral issues or attitude towards the foster parents" and that she did not know of any "history of [Stumbo] even dealing with children." (*Id.* at 27). Rachel also testified that Stumbo was told that "if he were approved for [K.M. and D.M.] to come live with him, that [Lively] would not be able to reside in the home." (*Id.*). She testified that Stumbo "seemed shocked at the fact that [Lively] could not live there." (*Id.*). Finally, when commenting on whether placement with Stumbo would

be appropriate for K.M. and D.M., Rachel remarked that "[i]n the past, [the agency has] had people come forward * * * to have children placed in their home, but there always is a concern * * * when a gentleman that doesn't know the girls wants to take two children into their home." (*Id.* at 28).

{¶34} On re-direct examination, Rachel testified that it was "correct" that, if given more time, the agency could continue to explore a kinship placement. (*Id.*). She testified that an extension would be required to further pursue a potential kinship placement. (*Id.* at 29). However, Rachel agreed that "[Lively] [had not] done anything to demonstrate to [the agency] that [she had] substantially progressed on the terms and conditions of the case plan" such that an extension was warranted. (*Id.*).

{¶35} Finally, the trial court questioned Rachel regarding the agency's efforts toward finding a kinship placement. (*See id.* at 29-30). Rachel testified that the agency explored the possibility of placing K.M. and D.M. with Lively's mother but that the agency "wasn't able to approve her." (*Id.* at 30). She stated that Lively's mother then recommended placement with Lively's brother and Lively's brother's wife, who is Milligan's sister. (*Id.*). Rachel testified that "[Milligan's sister] and [Lively's brother] * * * were interested" in being considered as a placement for K.M. and D.M. (*Id.*). However, she testified that the agency "ran SACWIS checks" on the couple, and "they were not able to be approved." (*Id.*).

{¶36} Thus, the record establishes that the agency and the trial court thoroughly considered numerous potential alternative placements for K.M. and D.M. but that each of them was rejected due to concerns over drug and alcohol abuse or previous exclusionary contact with Children Services. Moreover, the decision to rule out Stumbo as a placement option is reasonable and supported by the evidence. Although the record demonstrates that Stumbo had stable employment, passed drug screens, and voluntarily disclosed his previous criminal history, it also reflects that his home-study evaluation had not been completed, that he had negligible, if any, prior contact with K.M. and D.M., and that he had no discernible experience with children—let alone children with learning disabilities such as K.M. In addition, the record establishes that it was Lively's apparent intention to move in with Stumbo, K.M., and D.M. following her release from jail or completion of drug rehabilitation. Thus, placement with Stumbo is untenable as it could result in K.M. and D.M. being exposed again to Lively's drug use and other behaviors that caused them to be removed from Lively's custody in the first place.

{¶37} Finally, with respect to R.C. 2151.414(D)(1)(e)—whether any of the factors in R.C. 2151.414(E)(7)-(11) apply—there is no evidence in the record suggesting that any of the R.C. 2151.414(E)(7)-(11) factors apply to Lively, K.M., and D.M. Nevertheless, a trial court can award permanent custody to the state even in the absence of clear and convincing evidence as to one of the R.C.

2151.414(D)(1) factors. *See In re H.M.*, 2014-Ohio-755, at ¶ 28 ("A trial court can determine that granting permanent custody to the state is in the child's best interest, even with a lack of clear and convincing evidence in a single factor."), citing *In re Shaeffer Children*, 85 Ohio App.3d 683, 692 (3d Dist.1993). *See also In re Hershberger & Smith*, 3d Dist. Allen Nos. 1-04-55 and 1-04-61, 2005-Ohio-429, ¶ 31 (concluding that the trial court was not required to include a specific discussion of the R.C. 2151.414(E)(7)-(11) factors in its judgment entry granting permanent custody because those factors were inapplicable to the mother-appellant's case).

{¶38} Accordingly, based on the totality of the circumstances, the trial court's conclusion that it is in the best interest of K.M. and D.M. to award permanent custody of K.M. and D.M. to the agency is supported by clear and convincing evidence. Thus, the trial court did not err by awarding permanent custody of K.M. and D.M. to the agency.

{¶39} Lively's assignment of error is overruled.

{¶40} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgments of the trial court.

*Judgments Affirmed*

**WILLAMOWSKI, P.J. and SHAW, J., concur.**

**/jlr**