[Cite as *In re C.H.*, 2022-Ohio-1139.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## UNION COUNTY

IN RE:

C.H.                                                    CASE NO. 14-21-20

DEPENDENT AND NEGLECTED
CHILD.                                              O P I N I O N

[REBECCA P. - APPELLANT]

Appeal from Union County Common Pleas Court
Juvenile Division
Trial Court No. 2019JC147

**Judgment Affirmed**

**Date of Decision: April 4, 2022**

APPEARANCES:

*Courtland A. Perry* for Appellant

*Emma Mirles-Jones* for Appellee

Case No. 14-21-20

**MILLER, J.**

{¶1} Appellant, Rebecca[1] P., appeals the August 3, 2021 judgment of the Union County Court of Common Pleas, Juvenile Division, granting permanent custody of her biological son, C.H., to appellee, Union County Department of Job and Family Services (the "Agency"). For the reasons that follow, we affirm.

*Facts and Procedural History*

{¶2} Rebecca P. ("Mother") and Brandon H. are the biological parents of C.H., born August 2011.[2] On December 20, 2019, the Agency requested an ex parte order for emergency temporary custody of C.H. In support of the motion, the Agency alleged it received a report that Mother had been in possession of an illegal substance believed to be fentanyl. Furthermore, the Agency alleged that another occupant of the house found Mother and her boyfriend, Timothy Schaffer, overdosed on drugs on several occasions over the previous month. The Agency reported that Mother submitted to a drug screen which returned a positive result for fentanyl. That same day, after conducting an emergency hearing on the matter, the

---

[1] We note that in her appellate brief, Mother refers to herself as "Becca," however, because the notice of appeal names the appellant as "Rebecca," we have chosen to refer to her as such here. The discrepancy is more fully addressed in our discussion of Mother's first assignment of error.

[2] Although Brandon is a party to the proceeding, the record does not indicate that he filed a notice of appeal. Furthermore, by all accounts, Brandon had no interest in being part of the case plan or having any role in C.H.'s life. In fact, although Brandon attended a portion of the permanent-custody hearing, he chose not to return after the lunch recess. (July 30, 2021 Tr., Vol., II, at 5). At closing arguments, Brandon's attorney stated that Brandon did not contest the Agency's motion for permanent custody and believed that granting permanent custody to the Agency was in C.H.'s best interest. (*Id.* at 108-109). Accordingly, our review focuses primarily on the trial court's findings as they relate to Mother.

trial court granted the Agency's emergency ex parte motion for temporary custody of C.H.

{¶3} On December 23, 2019, the Agency filed a complaint alleging C.H. was a neglected and dependent child and requesting the trial court place the child in its temporary custody. Following a shelter-care hearing, held that same day, the trial court determined there was probable cause to find that C.H. was neglected and dependent. Further, the trial court continued C.H. in the Agency's temporary custody.

{¶4} At an adjudicatory hearing held before a magistrate on March 3, 2020, the trial court found C.H. to be a neglected child under R.C. 2151.03(A)(2) and a dependent child under R.C. 2151.04(C). Further, the magistrate continued C.H. in the Agency's temporary custody pending disposition. The magistrate filed its decision on March 4, 2020. That same day, the trial court adopted and approved the magistrate's decision.

{¶5} The following day, a dispositional hearing was held before a magistrate. In the magistrate's decision filed on March 6, 2020, the trial court found that it is in C.H.'s best interest for the trial court to continue C.H. in the Agency's temporary custody. On March 25, 2020, the trial court adopted and approved the magistrate's decision. Mother did not file an appeal challenging C.H.'s adjudication and initial disposition.

Case No. 14-21-20

{¶6} Throughout 2020, the trial court conducted several review hearings, each of which resulted in C.H. being continued in the Agency's temporary custody. Eventually, on February 18, 2021, the Agency filed a motion for permanent custody of C.H.

{¶7} At the conclusion of the permanent-custody hearing on July 30, 2021, the trial court granted the Agency's motion and awarded the Agency permanent custody of C.H. The trial court filed its judgment entry reflecting its decision on August 3, 2021.

{¶8} On September 3, 2021, Mother filed a notice of appeal. She raises five assignments of error for our review.

### Assignment of Error No. I

**The trial court committed reversible error by terminating the parental rights of "[Rebecca P.]" when the State failed to establish by clear and convincing evidence who was the mother of [C.H.] and that error was extremely prejudicial to [C.H.'s] biological mother [Becca P.].**

{¶9} In Mother's first assignment of error, she argues that the trial court erred by terminating the parental rights of "Rebecca P." despite C.H.'s biological mother's legal name being "Becca P."[3] Specifically, Mother argues that the Agency failed to establish the identity of C.H.'s biological mother by clear and convincing

---

[3] Mother does not allege that the trial court made any error with respect to her last name. Rather, the assignment of error only concerns Mother's first name.

evidence, thereby violating her right to due process. For the reasons that follow, we disagree.

**{¶10}** Throughout the judgment entry granting permanent custody of C.H. to the Agency, the trial court refers to C.H.'s biological mother as "Rebecca." However, in the complaint and throughout the vast majority of the record, C.H.'s biological mother is referred to as "Becca."

**{¶11}** The transcript of the permanent-custody hearing indicates that Mother and her trial counsel engaged in the following exchange:

[Mother's trial counsel]: Miss [P.], please state your name and address.

[Mother]: Rebecca [P.] * * *.

[Mother's trial counsel]: And what is your relationship with [C.H.]?

[Mother]: Mother.

(July 30, 2021 Tr., Vol. II, at 61). Additionally, the transcript was signed and certified as correct by the trial court judge who was personally present in the courtroom during the proceedings. (*Id.* at 125). Thus, the certified record indicates that Mother testified at the permanent-custody hearing that her name was "Rebecca" and she was C.H.'s biological mother.

**{¶12}** We note that Mother's appellate counsel, for the first time at oral argument, suggested that the transcript was incorrect. Specifically, Mother's

appellate counsel, who was not present in the courtroom during the trial court proceedings, stated that after listening to the audio recording of the permanent-custody hearing, she believed Mother did not actually say that her name was "Rebecca" but instead cleared her throat and then said "Becca." Mother's trial counsel opined that, as a result of Mother's lack of diction and clarity, the court reporter, who prepared the transcript from the audio recording, incorrectly transcribed Mother's name as "Rebecca."

{¶13} However, the burden is on the appellant to seek to correct or supplement the record in accordance with App.R. 9(E), if the appellant believes that there is an error in the record that is not portrayed in the transcript. Here, Mother did not attempt to modify, correct, or supplement the transcript in accordance with App.R. 9(E). Accordingly, any error relating to the accuracy of the transcript is waived. *See generally State v. Holsinger*, 4th Dist. Lawrence No. 18CA26, 2019-Ohio-5108, ¶ 10. *See also State v. Drurey*, 9th Dist. Medina No. 18CA0098-M, 2020-Ohio-227, ¶ 8 ("The obligation to provide all portions of the record necessary for appellate review falls to the appellant.").

{¶14} Moreover, we note that throughout the permanent-custody hearing, Mother's trial counsel referred to her as "Rebecca." The record does not indicate that Mother made any attempt to correct her trial counsel on the record. Furthermore, although the complaint, C.H.'s birth certificate, and the vast majority

of filings in the case note Mother's name as "Becca," several filings do refer to Mother as "Rebecca." (Doc. Nos. 162, 163, 166). The record does not indicate that Mother brought the alleged error to the trial court's attention or requested that the trial court remedy the alleged error.

{¶15} Furthermore, although Mother summarily argues in her appellate brief that the Agency failed to establish the identity of C.H.'s biological mother, the record does not support her position. As previously discussed, at the permanent-custody hearing, Mother identified herself as the biological mother of C.H. Throughout her testimony, Mother repeated her assertion that she is C.H.'s mother and testified to her progress working the case plan. Moreover, Mother's testimony that she is the biological mother of C.H. was consistent with the testimony of the other witnesses. Furthermore, at no point did any other witness or party come forward claiming to be the biological mother of C.H. and there is no argument that "Becca" and "Rebecca" are different people. Thus, we cannot find that the Agency failed to establish the identify of C.H.'s biological mother.

{¶16} Furthermore, although the record does refer to Mother as both "Becca" and "Rebecca," we do not find that the trial court committed reversible error by referring to her as "Rebecca" in the judgment entry granting the Agency permanent custody of C.H., particularly in light of the certified transcript indicating that Mother testified that her name is "Rebecca." Nonetheless, under the circumstances, it would

not be inappropriate for the trial court to issue a nunc pro tunc judgment entry clarifying that Mother is also known as "Becca."

{¶17} Accordingly, Mother's first assignment of error is overruled.

## Assignment of Error No. II

**The trial court lost its way in terminating parental rights of [Rebecca P.] contrary to the manifest weight of the evidence that [C.H.'s] biological mother had made substantial process in the case plan having maintained sobriety for approximately 10 months, had stable employment for 8 months, had stable housing, was paying child support, had purchased a birthday present, was participating in regular Zoom meetings despite having transportation challenges in addition to navigating all of the challenges posed by a global pandemic.**

## Assignment of Error No. III

**The trial court erred by terminating parental rights to [C.H.] when the Union County Children Services failed to make reasonable efforts to assisting Mother obtain better housing options or more reliable transportation for visitation purposes, while then condemning her for not securing ideal stable housing and failing to visit with [C.H.].**

## Assignment of Error No. IV

**The trial court erred in finding that Mother could not remedy the conditions of the complaint in a reasonable time despite acknowledging that Mother had been significantly stable because the Court felt that Mother did not have a plan if [C.H.] were returned to her. However, the Court failed to consider that the Agency did not have a plan for achieving permanancy [sic] either when no adoptive home had been identified, no family member was being considered for legal custody, and the 10 year old child was doomed to spend the rest of his life in a residential treatment facility.**

{¶18} In Mother's second, third, and fourth assignments of error, she argues that the trial court erred by granting permanent custody of C.H. to the Agency. Although presented as separate assignments of error, in her appellate brief, Mother presents the arguments as various challenges to the weight of the evidence supporting the trial court's granting of permanent custody to the Agency. Accordingly, we will address them together as such.

*Manifest-Weight Review of Permanent-Custody Decisions*

{¶19} "When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.""'" *In re Dn.R.*, 3d Dist. Shelby No. 17-20-06, 2020-Ohio-6794, ¶ 16, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115 (9th Dist.2001).

{¶20} In a permanent custody case, the ultimate question for a reviewing court is "whether the juvenile court's findings * * * were supported by clear and convincing evidence." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 43. "Clear and convincing evidence" is the "'measure or degree of proof that will

produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.'" *In re Dn.R.* at ¶ 17, quoting *In re Estate of Haynes*, 25 Ohio St.3d 101, 104 (1986). "In determining whether a trial court based its decision upon clear and convincing evidence, 'a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof.'" *Id.* at ¶ 18, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990). "Thus, if the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence." *In re R.M.*, 4th Dist. Athens Nos. 12CA43 and 12CA44, 2013-Ohio-3588, ¶ 55.

{¶21} "Reviewing courts should accord deference to the trial court's decision because the trial court has had the opportunity to observe the witnesses' demeanor, gestures, and voice inflections that cannot be conveyed to us through the written record." *In re S.D.*, 5th Dist. Stark No. 2016 CA 00124, 2016-Ohio-7057, ¶ 20. "A reviewing court should find a trial court's permanent custody decision against the manifest weight of the evidence only in the "'exceptional case in which the evidence

weighs heavily against the [decision].""" *In re Dn.R.* at ¶ 19, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

*Standards & Procedures for the Termination of Parental Rights*

**{¶22}** The right to raise one's child is a basic and essential right. *In re Murray*, 52 Ohio St.3d 155, 157 (1990), citing *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208 (1972) and *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625 (1923). "Parents have a 'fundamental liberty interest' in the care, custody, and management of the child." *Id.*, quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388 (1982). However, the rights and interests of a natural parent are not absolute. *In re Thomas*, 3d Dist. Hancock No. 5-03-08, 2003-Ohio-5885, ¶ 7. These rights may be terminated under appropriate circumstances and when the trial court has met all due process requirements. *In re Leveck*, 3d Dist. Hancock Nos. 5-02-52, 5-02-53 and 5-02-54, 2003-Ohio-1269, ¶ 6.

**{¶23}** "R.C. 2151.414 outlines the procedures that protect the interests of parents and children in a permanent custody proceeding." *In re N.R.S.*, 3d Dist. Crawford Nos. 3-17-07, 3-17-08 and 3-17-09, 2018-Ohio-125, ¶ 12, citing *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, ¶ 26. "When considering a motion for permanent custody of a child, the trial court must comply with the statutory requirements set forth in R.C. 2151.414." *In re A.M.*, 3d Dist. Marion No. 9-14-46,

2015-Ohio-2740, ¶ 13. "R.C. 2151.414(B)(1) establishes a two-part test for courts to apply when determining whether to grant a motion for permanent custody: (1) the trial court must find that one of the circumstances in R.C. 2151.414(B)(1)(a)-(e) applies, and (2) the trial court must find that permanent custody is in the best interest of the child." *In re Y.W.*, 3d Dist. Allen No. 1-16-60, 2017-Ohio-4218, ¶ 10.

{¶24} As relevant to this case, R.C. 2151.414(B)(1) provides:

> [T]he court may grant permanent custody of a child to a movant if the court determines at a hearing held pursuant to [R.C. 2151.414(A)], by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
>
> * * *
>
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *.

R.C. 2151.414(B)(1)(d).

{¶25} "'If the trial court determines that any provision enumerated in R.C. 2151.414(B)(1) applies,' it must proceed to the second prong of the test, which requires the trial court to 'determine, by clear and convincing evidence, whether granting the agency permanent custody of the child is in the child's best interest.'" *In re K.M.S.*, 3d Dist. Marion Nos. 9-15-37, 9-15-38 and 9-15-39, 2017-Ohio-142, ¶ 23, quoting *In re A.F.*, 3d Dist. Marion No. 9-11-27, 2012-Ohio-1137, ¶ 55 and

citing R.C. 2151.414(B)(1). "The best interest determination is based on an analysis of R.C. 2151.414(D)." *Id.*

**{¶26}** "Under R.C. 2151.414(D)(1), the trial court is required to consider all relevant factors listed in that subdivision, as well as any other relevant factors." *Id.* at ¶ 24, citing *In re H.M.*, 3d Dist. Logan Nos. 8-13-11, 8-13-12 and 8-13-13, 2014-Ohio-755, ¶ 27. The factors specifically listed in R.C. 2151.414(D)(1) are:

(a)   The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b)   The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c)   The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period * * *;

(d)   The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e)   Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1). "Under this test, the trial court considers the totality of the circumstances when making its best interest determinations. No single factor is given more weight than others." *In re N.R.S.*, 2018-Ohio-125, at ¶ 16.

*Analysis*

**{¶27}** Mother does not dispute that C.H. had been in the Agency's temporary custody for 12 or more months of a consecutive 22-month period at the time the Agency filed its motion for permanent custody on February 18, 2021. Therefore, Mother does not challenge the trial court's determination that R.C. 2151.414(B)(1)(d) applies to C.H. Instead, Mother argues the trial court erred by determining that permanent custody is in C.H.'s best interest. However, after examining the trial court's best-interest findings and reviewing the record, we conclude that clear and convincing evidence supports the trial court's best-interest determination.

*R.C. 2151.414(D)(1)(a)*

**{¶28}** With respect to R.C. 2151.414(D)(1)(a), the trial court found as follows:

> Pursuant to R.C. 2151.414(D)(1)(a), as to the interaction and interrelation of the child with the child's parents, relatives, foster caregivers, out of home providers and any other person who may significantly affect the child, the Court considers the evidence of the parents' failure to complete the Case Plan and the lack of sustained, meaningful, and successful engagement in Case Plan services designed to help Mother address and ameliorate her drug abuse, housing, parenting and other issues that would reasonably ensure the

child's health, safety and well-being.  Father has not engaged at all. Mother failed to complete the terms of the Case Plan and failed to comply with the terms of the Family Treatment Court.  Mother also failed to consistently visit the minor child, often cancelling visits. Further, evidence established that Mother's presence was a "trigger" for the minor child and his negative behaviors were worse following any visit with Mother.  Finally, while some relatives stepped forward for placement, they all requested that the child be removed from their care due to his behaviors.  No relatives were identified or filed any motions seeking custody of the minor child.

(Doc. No. 289).

{¶29} At the permanent custody hearing, Victoria Sexton, C.H.'s ongoing caseworker from December 2019 to March 2021, testified that the Agency became involved in C.H.'s case in December 2019 when it received a report alleging members of C.H.'s household used illegal substances around the child.   (July 30, 2021 Tr., Vol. II, at 5-7).  After Mother tested positive for fentanyl, the Agency created a safety plan which did not allow Mother to be unsupervised around C.H. (*Id.* at 8).  Sexton testified that C.H. has been in the Agency's custody since that time. (*Id.* at 8-9).  According to Sexton, C.H. had multiple placements, including several kinship placements and several placements with foster families; however, he was removed from each of those placements due to his behaviors at the request of the care providers. (*Id.* at 12-16).  Some of the behaviors described by C.H.'s caregivers included violent behaviors such as hitting other foster children and pets, sexualized behaviors such as viewing pornographic materials, taking nude photos of himself and other children, smearing feces, and trying to inappropriately touch

his foster mother, and destructive behaviors such as destroying his bedroom and breaking televisions. (July 30, 2021 Tr., Vol. I, at 26, 68-70, 72-73, 85-86, 97-98). Additionally, his caregivers recalled that he was prone to extreme outbursts of anger and experienced volatile and erratic behaviors. (*Id.* at 79-82, 109-113). At times, C.H.'s behavior elevated to such extremes that his caregivers called local law enforcement to intervene. (*Id.* at 81-82). At the time of the permanent-custody hearing, C.H. was placed at a residential treatment facility. (July 30, 2021, Tr., Vol. II, at 16).

{¶30} Sexton testified that Mother had supervised visitations with C.H. throughout the duration of the Agency's case; however, Mother was "not consistent at all" in exercising visitation. (*Id.* at 31-32). Specifically, Sexton testified that Mother began having visitations with C.H. in January 2020, but missed a visit the following month. (*Id.* at 33). When in-person visits resumed following a pause caused by the Covid-19 pandemic, Mother would attend the visits "sometimes." (*Id.* at 34). However, in August 2020, Sexton reported that Mother "completely disappeared" and did not have any contact with C.H. or the Agency for the entire month. (*Id.*). According to Sexton, although Mother resumed visitations with C.H. in September 2020, she would cancel the visits "for various reasons" and would sometimes not show up for visits without explanation. (*Id.*). Sexton confirmed that in the time the case had been open, Mother did not exercise any unsupervised

visitations with C.H. because she never showed up to visitations consistently or she gave positive drug screens, establishing her continued use of illegal substances. *(Id.* at 36).

**{¶31}** Joanne Rowland, C.H.'s foster parent from October 2020 to March 2021, confirmed that although C.H. had visitations with Mother during this time, there were some visitations that Mother missed. (July 30, 2021 Tr., Vol. I, at 74-75). Further, Rowland testified that following missed visitations with Mother, C.H.'s behavioral challenges worsened significantly. (*Id.* at 74-83). Further, Rowland stated that when Mother cancelled visitations, C.H. would get "really angry" and state that Mother did not love him and did not want to be with him. (*Id.* at 89).

**{¶32}** In one example, Rowland was in the car with C.H. when the ongoing caseworker called to inform her that Mother was not able to visit C.H. on Thanksgiving due to her failure to comply with the Covid-19 quarantine requirements of the sober living house where the family treatment court required her to reside. Rowland recalled that C.H. "lost it" at that moment. (*Id.* at 75-76). Rowland testified that C.H. was incontinent 17 times in a period of approximately two days and continued to have incontinence issues from that time on. (*Id.* at 76). Further, C.H. chose not to be engaged with members of Rowland's household and had increased sleeping difficulties. (*Id.* at 77-78).

-17-

{¶33} Rowland also recalled Mother's visitation with C.H. on Christmas Day of 2020. (*Id.* at 79). During this visitation, a Christmas present fell on the floor and C.H. reportedly "lost it." (*Id.* at 79). Rowland testified that C.H. cried and screamed at his Mother telling her that he hates her and asking her why she doesn't love him. (*Id.* at 79). Then, C.H. ripped up pictures of C.H. and Mother. (*Id.*). Rowland stated that Mother tried to calm C.H. down, but that Mother's efforts actually made C.H. more upset. (*Id.*). Rowland reported that C.H. eventually calmed down and continued the visit with Mother. (*Id.* at 79-80). However, Rowland described C.H.'s behavior in the days following the Christmas incident as "out of control." (*Id.* at 80). Rowland recalled that C.H. threatened to kill her, broke household items, and started acting out aggressively toward Rowland, the household pets, and Rowland's other foster child. (*Id.* at 80-81). Several times, the incidents required the assistance of law enforcement officers. (*Id.* at 81-82).

{¶34} According to Rowland, during the week following Mother's Christmas visitation, C.H.'s behavior and mental well-being reached a point that he was suicidal and homicidal and spent six days in the local hospital until he was stable enough to return to Rowland's home. (*Id.* at 82-83). Following his release from the hospital, C.H. was admitted into Youth Challenges, a partial-hospitalization program for children with behavioral challenges. (*Id.* at 83). However, Rowland stated that C.H.'s behaviors were beyond the scope of the Youth

Challenges program. (*Id.*). Then, C.H. was admitted into a youth residential-treatment program at Genacross and was released from Rowland's care. (*Id.*).

**{¶35}** Sexton, who supervised some visitations between C.H. and Mother testified that during the visits, C.H. and Mother would interact and engage in activities together. (July 30, 2020 Tr., Vol. II, at 38). However, Sexton recalled C.H. telling Mother that he doesn't want to have visitations. Further, Sexton described an "outburst" she witnessed in December 2020 that involved C.H. screaming, crying, and "trashing" his room. (*Id.* at 37-38).

**{¶36}** Susan Thompson, a pediatric nurse practitioner who treated C.H. from May 2020 to March 2021, testified that she diagnosed C.H. with post-traumatic stress disorder ("PTSD") and an adjustment disorder with mixed emotions and conduct. (July 30, 2021 Tr., Vol. I, at 17-18). Thompson stated that C.H. presented to her as a child who had been neglected, physically abused, and potentially sexually abused. (*Id.* at 42-43). Thompson described Mother as a "trigger" for C.H. (*Id.* at 21). She also described the source of C.H.'s trauma as being afraid of Mother. (*Id.* at 23). Thompson described some of C.H.'s behaviors, such as encopresis and incontinence, as being common in children with moderate to severe abuse and trauma. (*Id.* at 26-27). Thompson relayed her understanding that C.H.'s behaviors would worsen following exposure to his Mother and described Mother's missed visits as "trauma." (*Id.* at 28).

{¶37} With respect to C.H.'s relationship with Mother, Thompson stated that C.H. had a desire to have his Mother love him and express that love. (*Id.* at 29). Moreover, Thompson stated that she did not doubt that C.H. and Mother had love for each other. (*Id.*). However, Thompson indicated that Mother not being consistent with visitations and making promises to C.H. which were not followed through as "one insult to [C.H.] after another." (*Id.*).

{¶38} Thompson also testified that she wrote a letter to Union County Children's Services in January 2021 requesting the Agency suspend C.H.'s visitations with Mother. (*Id.* at 29). Thompson stated that, at the time she wrote the letter, she believed that C.H. "needed a break from his mother" because of Mother's lack of consistency in visitation was "too much" for C.H. (*Id.* at 30). According to Thompson, whether Mother saw C.H. or not, "she was the main trigger" for his behaviors. (*Id.* at 29-30).

{¶39} For her part, Mother admitted that she is "very aware" of the impact on C.H. and the negative behaviors that occurred when she canceled visitations. (July 30, 2021 Tr., Vol. II, at 87). Mother further acknowledged that it was not in C.H.'s best interest for her to continue to miss scheduled in-person visitations. (*Id.* at 88). Nevertheless, she admitted that she has not exercised in-person visitation with C.H. in the time that he has been at Genacross despite having two in-person visitations scheduled. (*Id.* at 65-66). Mother stated that she missed the first

visitation due to transportation issues and she missed the second visitation because she "misunderstood the date" of the visitation and transcribed it incorrectly into her calendar. (*Id.* at 90). Mother stated that she had several recent visitations with C.H. over video conference. (*Id.* at 90-91). Mother also indicated that she had an in-person visitation with C.H. scheduled for that upcoming Sunday and that she arranged reliable transportation for that visitation. (*Id.* at 91). According to Mother, the visitation was to celebrate C.H.'s birthday and she stated that she had a birthday present purchased for him. (*Id.* at 88-89).

{¶40} Mother attributes C.H.'s angry outbursts to missing her. (*Id.* at 92). She stated that C.H. has "every right to be angry with [her]" but that he "misses [her] at the same time." (*Id.* at 91-92). She alleged that C.H.'s behavioral outbursts following her visitations or missed visitations are being used against her to make "it look like [they are] toxic for each other." (*Id.*). However, she admitted that the escalated behaviors result when she fails to follow through on her commitment to visit him. (*Id.* at 94). Mother opined that C.H.'s behaviors would escalate after a cancelled meeting because he does not understand that he cannot come home with her. (*Id.*). According to Mother, this misunderstanding leads C.H. to be angry and act out. (*Id.*). Mother admitted that C.H. is angry with her but stated that he loves her and needs her in his life. (*Id.* at 91-92). Mother further acknowledged, that C.H. has had "so much instability" in his life and "is confused." (*Id.* at 94).

**{¶41}** With respect to their relationship, Mother stated that she and C.H. used to be very bonded but that they are not as bonded anymore. (*Id.* at 92). However, she attributed their strained relationship to the ongoing case with the Agency which forced them to be separated. (*Id.*).

**{¶42}** At the permanent-custody hearing, Sexton outlined the case plan that the Agency developed for C.H. and Mother. (July 30, 2021 Tr., Vol. II, at 22). (*See* State's Ex. 10). The most recent version of the case plan outlined four concerns relating to the family and the action steps necessary to address each of the concerns. (July 30, 2021 Tr., Vol. II, at 22). Three of the concerns related specifically to Mother and one of the concerns related exclusively to C.H. (*Id.*). The first concern stated was that Mother was not able to maintain consistent housing. (*Id.*). The steps outlined to address this concern were (1) Mother would apply for Section 8 rental assistance; (2) Mother would explore and apply for low income or subsidized housing; (3) Mother would obtain a safe and stable place that C.H. can live in; and (4) Mother will utilize People in Need, Inc. of Delaware County if she is facing eviction or utility shut off. (*Id.* at 22-23).

**{¶43}** With respect to this concern and the related actions steps, Sexton stated that Mother moved frequently throughout the case and, at the time of the filing of the motion for permanent custody, had recently moved in with her new boyfriend. (*Id.* at 23). According to Sexton, throughout the case, Mother did not establish a

stable residence and was often living with other people. (*Id.* at 23-24). Sexton stated that Mother is on the wait list for one low-income apartment complex, but she did not apply for Section 8 rental assistance. (*Id.*). Further, People in Need of Delaware County did not provide assistance for Mother. (*Id.* at 23). Sexton stated that she did not believe Mother had obtained a safe and stable place for C.H. to live. (*Id.* at 23). For her part, Mother admitted that she lived at nine different addresses during the pendency of the instant case. (*Id.* at 76-77). However, she stated that she was now living in a stable home, although her name was not on the lease. (*Id.* at 76-77, 88).

{¶44} The second concern addressed in the case plan related to Mother's use of illegal substances in the home with C.H. present. (*Id.* at 24). To address this concern, the Agency developed several actions steps. (*Id.*). First, Mother was to receive an assessment for Union County Family Treatment Court ("FTC"), and if eligible, participate in FTC and comply with FTC court orders. (*Id.*). Mother was also to receive a mental-health assessment and alcohol-and-drug assessment ("AOD") from a provider of her choice. (*Id.*). According to Sexton, Mother did complete a mental-health assessment and AOD. (*Id.* at 25). Mother also received an assessment for FTC and was eligible to participate. (*Id.*). Lauren Levingston, the Union County Juvenile and Probate Court treatment coordinator testified that Mother entered FTC on July 23, 2020. (July 30, 2021 Tr., Vol. I, at 115, 117).

However, for the majority of her participation in FTC, Mother was non-compliant. (*Id.* at 120). Levingston stated that the major cause of Mother's non-compliance was her drug use. (*Id.*). Specifically, Levingston testified that Mother had multiple positive drug screens for cocaine and fentanyl. (*Id.*). (*See* State's Ex. 1, 2). Levingston stated that in the beginning of her participation in FTC, Mother struggled to be free of substances. (July 30, 2021 Tr., Vol. II, at 124). However, once she did remain clean of substances, she struggled with the expectations of FTC. (*Id.*). For example, when Mother was residing in a sober-living home, she refused to follow the home's requirements relating to quarantine following an exposure to Covid-19. (*Id.* at 124-129). Rather, Mother chose to leave the sober-living housing to go to work and to the nail salon. (*Id.* at 124). Further, due to her unwillingness to quarantine for the required time, she was unable to exercise visitation with C.H. during Thanksgiving 2020 due to concerns that she could expose C.H. to Covid-19. (*Id.* at 128-129). Levingston testified that Mother was not successful in FTC and agreed to be unsuccessfully terminated from FTC in January 2021. (*Id.* at 129-130).

{¶45} Mother agreed that her tenure with FTC was "challenging" and that she was non-compliant more often than she was compliant during the program. (July 30, 2021 Tr., Vol. II, at 77-78). Mother acknowledged that she had non-compliances due to both failed drug screens and missed drug screens. (*Id.* at 78-79). Mother admitted that she agreed to be unsuccessfully terminated from FTC,

but thought that it was in her best interest at the time, even though she knew it may have negative repercussions with the ongoing case. (*Id.* at 79-80). Mother also admitted that she chose not to follow the quarantine requirements of the sober-living home and instead chose to go to work and get her nails done. (*Id.* at 80). Mother further conceded that in making the decision not to quarantine, she was thinking about maintaining her employment rather than her visitations with C.H. (*Id.* at 82).

{¶46} Next, the case plan required Mother to follow any recommendations made by treatment providers, including individual therapy. (*Id.* at 24). Sexton testified that Mother was assessed by several mental-health providers who recommended that she receive individual and group counseling. (*Id.* at 25-26). However, according to Sexton, Mother did not comply with the providers' recommendations. (*Id.*). Rather, she sporadically attended counseling sessions and frequently missed sessions, often without notice. (*Id.* at 26-27). Mother admitted during her testimony that she was not currently attending counseling sessions and does not believe she needs to be in counseling. (*Id.* at 66-67); (July 30, 2021 Tr., Vol. I, at 82-84).

{¶47} The case plan also required Mother to submit to random drug tests as required by the Agency. (July 30, 2021 Tr., Vol. II, at 24-25). Sexton and Levingston both testified that Mother had multiple missed drug screens and drug screens which indicated the presence of illegal substances. (*Id.* at 27); (July 30,

2021 Tr., Vol. I, at 121-122). Specifically, Sexton testified that Mother had approximately 10 to 15 positive screens for fentanyl and that Mother failed to complete approximately 10 to 15 additional drug screens. (July 30, 2021 Tr., Vol. II, at 27). Mother admitted she had some missed and positive drug screens but maintained she was currently not using illegal drugs. (*Id.* at 72-73, 77-79).

{¶48} Sexton testified that the case plan's final concern relating to Mother was that C.H. had made statements that his Mother did not care about him or that he wanted her to leave visitations. (*Id.* at 28). Further, C.H.'s negative behaviors increase following visitations and phone calls with Mother. (*Id.*). Additionally, Mother has used poor judgement with respect to individuals she allows to be around C.H. (*Id.*). To address the case plan concerns, Mother was to attend an assessment for family services at Ohio Guidestone. (*Id.* at 29). Mother was then to comply with the recommendations of the assessment including completing a parenting instruction program. (*Id.* at 29-30). Mother was also to receive particularized instruction and guidance regarding C.H.'s particularized behavioral and mental-health needs. (*Id.* at 30). However, according to Sexton, Mother did not complete the evaluation with Ohio Guidestone and, therefore, did not complete the counseling and services outlined in the case plan. (*Id.*).

{¶49} Thus, based on the foregoing, it is clear that C.H.'s visitations with Mother, or lack thereof, were a source of great turmoil for C.H. Furthermore,

Mother did not complete the terms of the case plan. Moreover, although C.H. was placed with several kinship providers during the course of the case, the providers all requested he be removed from their care due to his behavior. Thus, the record supports the trial court's findings under R.C. 2151.414(D)(1)(a).

*R.C. 2151.414(D)(1)(b)*

{¶50} Regarding R.C. 2151.414(D)(1)(b), the trial court found that "[C.H.'s] wishes, as expressed through his CASA/Guardian ad litem, were that he wished to be with Mother but then spoke of returning to the home of Ms. Rowland, a former foster parent." (Doc. No. 289). At the permanent-custody hearing, John Murray, C.H.'s GAL, testified that, if given the choice, C.H. would likely say that he wants to live with "mom." (July 30, 2020 Tr., Vol. II, at 97-98). However, Murray stated that he was not sure that C.H. was referencing Mother. (*Id.* at 98). Murray recounted that when he asked C.H. in May 2021 who he wanted to live with, C.H. was actually referencing Rowland when he spoke about his "mom." (*Id.*). Murray opined that what C.H. actually wants is "stability." (*Id.*). Therefore, the record supports the trial court's findings under R.C. 2151.414(D)(1)(b).

*R.C. 2151.414(D)(1)(c)*

{¶51} As to R.C. 2151.414(D)(1)(c), the trial court stated, "[t]he Court considered the custodial history of the child and the fact that the child has been in

the temporary custody of the agency for twelve or more months of a consecutive twenty-two month period." (Doc. No. 289).

**{¶52}** It is undisputed that the Agency first gained temporary custody of C.H. on December 20, 2019 and that he remained in the Agency's temporary custody from that date through the date of the permanent-custody hearing on July 30, 2021. Moreover, at the permanent-custody hearing, Sexton testified that C.H. has been in the temporary custody of the Agency since December 20, 2019 and provided testimony regarding each of his placements during that time. (July 30, 2021 Tr., Vol. II, at 8-9, 14-16). Thus, the record supports the trial court's findings under R.C. 2151.414(D)(1)(c).

*R.C. 2151.414(D)(1)(d)*

**{¶53}** With respect to R.C. 2151.414(D)(1)(d), the trial court found as follows:

> Pursuant to R.C. 2151.414(D)(1)(d), as to the child's need for a permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the Agency, the Court finds by clear and convincing evidence that [C.H.] cannot achieve a permanent placement unless permanent custody is granted to the Agency. Although Mother wishes to have six more months to work the Case Plan, she already has had about 19 months to do so. During that time, she failed to complete the Case Plan services, failed to visit consistently with the minor child and cancelled many visits. Mother testified that she had no plan if the child were to be returned to her other than [C.H.] would be residing with her and Mr. Douglas, a Tier I sex offender, as testified to, which would not be a good environment for the minor child. Given the issues involved herein and due to the significant needs of the child, it does not appear that

Mother is able to safely parent the child and deal with his behaviors. She has not availed herself of any programs to help train her to care for the minor child considering his particularized needs. Further, her intermittent involvement with the child has been a trigger for the child's escalating behaviors. The child's Father, [Brandon H.], has indicated that he does not wish to have the child in his home. No other permanent placements have been identified.

(Doc. No. 289).

**{¶54}** At the permanent custody hearing, Mother testified that she wished to have C.H. returned to her care and requested six more months to work on the case plan. (July 30, 2021 Tr., Vol. II, at 68). Mother stated that she could "possibly" be an appropriate placement for C.H. again. (*Id.* at 68, 71-72). Mother testified that she is living in a home with her current boyfriend, Dustin Douglas. (*Id.* at 76-77). However, she admitted that Douglas is a Tier I registered sex offender and was placed on the sex offender registry for unlawful sexual conduct with a minor. (*Id.* at 77). Mother stated that she does not "technically want to" bring C.H. into a home with a sexual offender; however, she stated that she is currently pregnant with Douglas's child and wants to have Douglas's support in raising their unborn child and she intends to stay in the home with him. (*Id.* at 64, 77). Murray, C.H.'s GAL expressed concern that Mother was living with a registered sex offender and intended to bring C.H. into the home. (*Id.* at 97).

**{¶55}** Furthermore, Mother testified that she has never called to speak to C.H.'s doctors or counselors. (*Id.* at 71). Mother admitted that she does not have a

plan as to where C.H. would receive ongoing services and counseling if he was returned to her care. (*Id.* at 72). When asked if she would be able to handle C.H.'s behaviors if he was returned to her care, Mother answered, "I think I would do my best to handle his behaviors. They are a lot. * * * I think there needs to be a lot of family counseling done * * * for both of us * * * which has not been done * * *." (*Id.* at 71). Mother further admitted that she has not been incorporated into C.H.'s current counseling sessions. (*Id.* at 66). Mother also stated that she did not have reliable transportation to get C.H. to medical appointments. (*Id.* at 65- 66). Although, she testified that she planned on getting another vehicle "soon." (*Id.* at 66).

{¶56} "'A legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs.'" *In re K.M.*, 3d Dist. Crawford Nos. 3-18-11 and 3-18-12, 2018-Ohio-3711, ¶ 29, quoting *In re M.B.*, 4th Dist. Highland No. 15CA19, 2016-Ohio-793, ¶ 56. By all accounts, C.H. is a child with specialized behavioral and mental-health needs. However, through her lack of commitment to the case plan, Mother has failed to demonstrate that she has the ability to provide a permanent placement for the child. In addition to her failure to consistently engage in visitation with C.H. and complete the counseling and parenting courses outlined in the case plan, Mother also intended

to bring C.H. into a home with an individual convicted of a sexual crime involving a minor. Mother failed to demonstrate that she has the ambition and ability to tend to C.H.'s particularized medical and behavioral needs. Ultimately, by failing to adequately remedy the conditions that resulted in C.H.'s removal from her home, Mother has not demonstrated she is capable of dependably providing for C.H.'s particularized needs in a stable environment. Thus, the record supports the trial court's findings under R.C. 2151.414(D)(1)(d).

{¶57} In sum, competent and credible evidence supports each of the trial court's best-interest findings. Based on the testimony presented at the permanent-custody hearing, clear and convincing evidence supports the trial court's determination that permanent custody is in C.H.'s best interest. Therefore, we conclude that the trial court's decision awarding permanent custody of C.H. to the Agency is not against the manifest weight of the evidence.

{¶58} Accordingly, Mother's second, third, and fourth assignments of error are overruled.

### Assignment of Error No. V

**The trial court erred in admitting several exhibits into evidence that were admittedly created for purposes of the trial and not created in the normal course of ordinary business contrary to the Rules of Evidence 803(6) and did not make findings required by Rule 1006.**

**{¶59}** In her fifth assignment of error, Mother argues that the trial court erred by admitting several exhibits into evidence over the objection of Mother's trial counsel. Specifically, Mother argues the trial court erred by admitting State's Exhibits 3, 4, and 5 into evidence. State's Exhibit 3 is a list of the services the Agency provided to Mother and C.H., State's Exhibit 4 is a log recording Mother and C.H.'s visitations, and State Exhibit 5 is a case timeline. (*See* State's Exs. 3, 4, 5). These lists were prepared from the extensive casefile maintained by the Agency.

**{¶60}** "Trial courts have broad discretion in deciding whether to admit evidence." *In re Za.C.*, 3d Dist. Allen Nos. 1-13-43 and 1-13-44, 2014-Ohio-979, ¶ 35. "A decision to admit or exclude evidence will be upheld absent an abuse of discretion." *Beard v. Meridia Huron Hosp.*, 106 Ohio St.3d 237, 2005-Ohio-4787, ¶ 20. An abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "Even in the event of an abuse of discretion, a judgment will not be disturbed unless the abuse affected the substantial rights of the adverse party or is inconsistent with substantial justice." *Beard* at ¶ 20.

**{¶61}** Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Generally, hearsay statements are excluded from evidence. However, a hearsay statement may be admissible if it falls within a

recognized exception. One such exception to the exclusion of hearsay statements are records of a regularly conducted activity as found in Evid.R. 803(6). While Mother does not contest the propriety of the casefile as a business record maintained by the Agency, she objects to the summary admitted into evidence claiming a violation of Evid.R. 1006.

{¶62} Evid.R. 1006 provides as follows:

The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at a reasonable time and place. The court may order that they be produced in court.

{¶63} At the permanent-custody hearing, Sexton, the Agency's ongoing caseworker assigned to the instant case, testified that she prepared State's Exhibits 3, 4, and 5 for the purpose of trial. (July 30, 2021 Tr., Vol. II, at 54). Sexton stated that she created State's Exhibits 3, 4, and 5 based on the contents of her case file, which contains approximately 500 pages of records. (*Id.* at 12-13). She also testified that the casefile records are based on her personal observations and knowledge or the observations of other caseworkers in the course of their employment. (*Id.* at 33). Sexton further stated that the documents were created close in time to the events upon which they are based. (*Id.*).

{¶64} In support of her argument that State's Exhibits 3, 4, and 5 were inadmissible, Mother relies on *Daniels v. Northcoast Anesthesia Providers, Inc.*, a

case in which the appellate court held that the trial court erred by admitting evidence offered pursuant to Evid.R. 1006 on the basis that the information contained in the summary contained the opinions of the person creating the summary. *Daniels v. Northcoast Anesthesia Providers, Inc.*, 8th Dist. Cuyahoga No. 105125, 2018-Ohio-3562, ¶ 32-34. However, here, Mother does not argue that State's Exhibits 3, 4, and 5 are embellished or inaccurate and did not raise such a concern at the permanent-custody hearing. Further, our review of State's Exhibits 3, 4, and 5 indicates that the documents are summaries containing factual information and do not contain the author's opinions. (*See* State's Exs. 3, 4, 5).

{¶65} Furthermore, although Mother argues that the trial court erred by failing to review the documents upon which the summaries were based, the record does not indicate that Mother requested the trial court to do so. Nor does the record indicate that the Agency failed to produce the documents. Additionally, Mother does not argue that the content of the voluminous writings is inadmissible or inaccurate.

{¶66} Finally, Mother fails to demonstrate that she was prejudiced by the admission of the contested exhibits. Rather, the record indicates that much of the information contained in State's Exhibits 3, 4, and 5 was cumulative of direct testimony given by witnesses at the hearing based on their personal knowledge. Notably, the trial court's findings did not rely on evidence found exclusively in

State's Exhibits 3, 4, and 5.  Thus, we cannot find that the trial court abused its discretion in admitting State's Exhibits 3, 4, and 5.

**{¶67}** Accordingly, Mother's fifth assignment of error is overruled.

**{¶68}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the Union County Court of Common Pleas, Juvenile Division.

*Judgment Affirmed*

**ZIMMERMAN, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**